## State of Vermont v. Ralph O. Oakes

[598 A.2d 119]

No. 89-506

Present: **Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.**

Opinion Filed July 5, 1991

Dissenting Opinion Filed September 6, 1991

*William Wright*, Bennington County State's Attorney, Bennington, and *Thomas Kelly*, Drug Attorney, and *Pamela Hall Johnson*, Department of State's Attorneys, Montpelier, for Plaintiff-Appellee.

*Charles S. Martin* of *Martin & Paolini, P.C.*, Barre, for Defendant-Appellant.

**Allen, C.J.** The issue presented on appeal to this Court is whether our state exclusionary rule for violations of Article 11

of the Vermont Constitution should be limited by the "good faith" exception articulated by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984). We hold that it should not. Accordingly, the trial court's denial of defendant's suppression motion is reversed, and the cause is remanded.

On March 1, 1989, Detective Michael Colgan of the Bennington Police Department applied for and received a warrant to search the residence of defendant's girl friend. That evening Detective Colgan and other officers executed the warrant. Their search uncovered a large plastic bag, inside of which were twelve smaller bags containing marijuana.

Defendant was charged with felony possession of marijuana under 18 V.S.A. § 4224(e)(1)(B) (repealed 1989). Prior to trial, defendant moved to suppress the evidence seized in the search on the ground that there had not been sufficient probable cause for issuance of the warrant, and consequently the search violated Chapter I, Article 11 of the Vermont Constitution[1] and the Fourth Amendment of the United States Constitution. At the hearing on defendant's motion, the court concluded that under both federal and state law there was "not sufficient probable cause shown by the affidavit" accompanying the warrant application to authorize issuance of the warrant. Nevertheless, the court went on to deny defendant's motion to suppress. The court, finding that Detective Colgan had acted in good faith, held the evidence admissible despite the Fourth Amendment violation because of the good faith exception to the federal exclusionary rule crafted in *Leon*. It also held that the Article 11 violation likewise did not require exclusion where the officer had acted in good faith.

Defendant moved for and was granted permission to appeal the court's denial of his suppression motion. His appeal rests

---

[1] Chapter I, Article 11 provides:

That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

solely on the proper construction of our state exclusionary rule for Article 11 violations. We have, however, reviewed the court's determination that the affidavit accompanying the warrant application did not constitute sufficient probable cause for issuance of the warrant. We agree with this determination.

## A.

This Court has adopted an exclusionary rule for violations of the Vermont Constitution.[2] "Evidence obtained in violation of the Vermont Constitution, or as the result of a violation, cannot be admitted at trial as a matter of state law." *State v. Badger*, 141 Vt. 430, 452–53, 450 A.2d 336, 349 (1982). This was not done under compulsion of *Mapp v. Ohio*, 367 U.S. 643 (1961), which worked only to extend to state courts an exclusionary rule for federal constitutional violations. *Id.* at 655. Rather, a state exclusionary rule was adopted because "[i]ntroduction of [illegally obtained] evidence at trial eviscerates our most sacred rights, impinges on individual privacy, perverts our judicial process, distorts any notion of fairness, and encourages official misconduct." *Badger*, 141 Vt. at 453, 450 A.2d at 349. The State now invites us to follow the Supreme Court's holding in *Leon* and except from our state exclusionary rule evidence seized by a police officer in objectively reasonable reliance on a subsequently invalidated warrant—the so-called "good faith" exception to the exclusionary rule. We decline the invitation.[3]

The United States Supreme Court has distinguished between the rights guaranteed an individual by the Fourth Amendment and the remedy adopted to effectuate those rights. In the thirty

---

[2] The exclusionary rule for a violation of V.R.Cr.P. 41(c)'s probable cause standard is the same as that for a violation of Article 11. *State v. Ballou*, 148 Vt. 427, 433 n.2, 535 A.2d 1280, 1283 n.2 (1987).

[3] We are not alone in our rejection of a good faith exception. States rejecting the exception on state constitutional grounds include: *State v. Marsala*, 216 Conn. 150, 579 A.2d 58 *passim* (1990); *State v. Novembrino*, 105 N.J. 95, 519 A.2d 820 *passim* (1987); *People v. Bigelow*, 66 N.Y.2d 417, 427, 488 N.E.2d 451, 458, 497 N.Y.S.2d 630, 637 (1985); *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 *passim* (1988); *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 *passim* (1991); see also *Stringer v. State*, 491 So. 2d 837, 841 (Miss. 1986) (Robertson, J., concurring). Massachusetts has rejected the exception on statutory grounds. *Commonwealth v. Upton*, 394 Mass. 363, 370 n.5, 476 N.E.2d 548, 554 n.5 (1985).

years following *Mapp*, a majority of the Supreme ·Court has consistently treated the federal exclusionary rule as a remedy distinct from the constitutional right itself. As the Supreme Court asserted in *Leon*, the exclusionary rule "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" 468 U.S. at 906 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). When the Supreme Court addresses the scope of the federal exclusionary rule, it does not focus on an individual's constitutional rights; rather it weighs the additional deterrent effect on official misconduct that excluding the unlawfully obtained evidence will achieve against the cost of excluding this evidence.[4]

We need not, and do not, express an opinion today on the validity of drawing such a distinction between the rights guaranteed by Article 11 and our state exclusionary rule. Even if our exclusionary rule were no more than a judicially created remedy, this Court would maintain the obligation to ensure that the remedy effectuates Article 11 rights. We point out the distinction made by the Supreme Court simply to clarify the amount of deference we will accord its decision in *Leon*. By treating the federal exclusionary rule as a judicially created remedy rather than a constitutional right, the Supreme Court's decision focuses, not on interpretation of the federal constitution, but on an attempted empirical assessment of the costs and

---

[4] See, e.g., *United States v. Havens*, 446 U.S. 620, 627–28 (1980) (incremental furthering of deterrence does not justify excluding unlawfully obtained evidence offered to impeach defendant's testimony during cross-examination); *Stone v. Powell*, 428 U.S. 465, 493–94 (1976) (further deterrent effect of allowing federal habeas corpus review of state court convictions on unlawful search and seizure grounds is outweighed by costs); *United States v. Janis*, 428 U.S. 433, 453–54 (1976) (exclusion of unlawfully seized evidence from federal civil proceedings not shown to have an additional deterrent effect sufficient to outweigh costs); *United States v. Calandra*, 414 U.S. 338, 351–52 (1974) (incremental deterrent effect of extending exclusionary rule to grand jury proceedings does not outweigh costs of impeding grand jury's role); see also Schrock & Welsh, *Reconsidering the Constitutional Common Law*, 91 Harv. L. Rev. 1117, 1118–19 (1978) (finding the Supreme Court's exclusionary rule jurisprudence to be a "subconstitutional calculation of costs and benefits," and labelling the progression of its decisions a "process of deconstitutionalization").

benefits of creating a good faith exception to the federal exclusionary rule. This empirical assessment can inform this Court's decision on the good faith exception only to the extent that it is persuasive. If the assessment is flawed, this Court cannot simply accept the conclusion the Supreme Court draws from it. To do so would be contrary to our obligation to ensure that our state exclusionary rule effectuates Article 11 rights, and would disserve those rights.

## B.

In *Leon* the Supreme Court fashioned a good faith exception to the exclusionary rule by "conclud[ing] that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." 468 U.S. at 922.

The Court's treatment of the "substantial costs" of not adopting a good faith exception is summary:

> The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern. . . . An objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains.

*Id.* at 907. In a footnote the Court concedes that many researchers "have concluded that the impact of the exclusionary rule is insubstantial." *Id.* at 907 n.6. Yet the Court answers, without citing empirical data, that the researchers' focus on nonprosecution and nonconviction of felony cases "mask a large absolute number of felons who are released because the cases against them were based in part on illegal searches or seizures." *Id.*

The Court's treatment of the "marginal or nonexistent benefits" of not adopting a good faith exception is more extensive. Taking the possible benefit of the exclusionary rule solely to be deterrence of official misconduct, see *id.* at 906, 921 n.22, the Court attempts to assess the deterrent effect that excluding evidence in this situation will have upon the officials involved: the police and the judicial authorities who issue warrants.

As to the police, the Court reasons that where the individual officer's reliance on a subsequently invalidated warrant is objectively reasonable, there is nothing to deter. "[W]here the officer's conduct is objectively reasonable, 'excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances.'" *Id.* at 919–20 (quoting *Stone v. Powell*, 428 U.S. 465, 539–40 (1976) (White, J., dissenting)). The Court dismisses as "speculative" arguments that applying the exclusionary rule in this situation would lessen the incentive for officers to prematurely approach judicial authorities with inadequate facts in the hope that they will get by, and would discourage "magistrate shopping." *Id.* at 918.

As to the judicial authorities who issue warrants, the Court proceeds from the premise that the exclusionary rule does not apply to them to the conclusion that it has no deterrent effect on them.

> To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates in these areas, their reliance is misplaced. First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.
>
> Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.

*Id.* at 916.

## C.

Criticism of the Supreme Court's cost-benefit approach to the exclusionary rule has been extensive. Voiced by commenta-

tors prior to *Leon*,[5] the arguments were forcefully marshalled in Justice Brennan's dissenting opinion. 468 U.S. at 928, 948–59 (Brennan, J., dissenting).[6] A new wave of criticism followed issuance of *Leon*,[7] and has been used by the highest courts of states in their rejection of a good faith exception to their exclusionary rules.[8] We do not find it necessary to recite the full content of this criticism. Consideration of a few basic strands is sufficient to create substantial doubt concerning the Supreme Court's conclusions.

---

[5] Davies, *A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests*, 1983 Am. B. Found. Res. J. 611; Kamisar, *Does (Did) (Should) the Exclusionary Rule Rest on a "Principled Basis" Rather Than an "Empirical Proposition"?*, 16 Creighton L. Rev. 565 (1983); Mertens & Wasserstrom, *The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law*, 70 Geo. L.J. 365 (1981); Nardulli, *The Societal Cost of the Exclusionary Rule: An Empirical Assessment*, 1983 Am. B. Found. Res. J. 585; Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and Seizure Cases*, 83 Colum. L. Rev. 1365 (1983).

[6] Justice Brennan begins his dissent with a perceptive assessment of the majority's analysis.

> The Court seeks to justify [its] result on the ground that the "costs" of adhering to the exclusionary rule in cases like those before us exceed the "benefits." But the language of deterrence and of cost/benefit analysis, if used indiscriminately, can have a narcotic effect. It creates an illusion of technical precision and ineluctability. It suggests that not only constitutional principle but also empirical data support the majority's result. When the Court's analysis is examined carefully, however, it is clear that we have not been treated to an honest assessment of the merits of the exclusionary rule, but have instead been drawn into a curious world where the "costs" of excluding illegally obtained evidence loom to exaggerated heights and where the "benefits" of such exclusion are made to disappear with a mere wave of the hand.

*United States v. Leon*, 468 U.S. 897, 929 (1984) (Brennan, J., dissenting).

[7] 1 W. LaFave, Search and Seizure § 1.3 (2d ed. 1987); Alschuhler, *"Close Enough for Government Work": The Exclusionary Rule After Leon*, 1984 Sup. Ct. Rev. 309; LaFave, *"The Seductive Call of Expediency": United States v. Leon, Its Rationale and Ramifications*, 1984 U. Ill. L. Rev. 895; Wasserstrom & Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am. Crim. L. Rev. 85 (1984).

[8] *State v. Marsala*, 216 Conn. at 160–71, 579 A.2d at 63–68; *State v. Novembrino*, 105 N.J. at 152–54, 519 A.2d at 853–54.

First, there is an inconsistency between the Court's labelling the exclusionary rule's costs as "substantial" and the Court's concession that many of the researchers upon whom it relies have concluded that the costs are "insubstantial." *Leon*, 468 U.S. at 908 n.6. The Court cites to the empirical data in Davies, *A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests*, 1983 Am. B. Found. Res. J. 611, 621, which suggests that the cumulative effect of the exclusionary rule is the nonprosecution or nonconviction of between 0.6% and 2.35% of felony arrests.[9] Davies, however, does not interpret this data as revealing substantial costs.

> While those loss rates should not be viewed as trivial, they do not amount to a "major impact" on criminal justice—especially when one considers that these loss rates relate to *arrests* and that many such lost arrests would have been dropped or downgraded to misdemeanors for other reasons even if there were no illegal search problems. Indeed . . . it is likely that in some proportion of these "lost" arrests, the police were not concerned with making arrests that would "stick." . . .
>
> . . . All the available evidence . . . indicates that *the general level of the rule's effects on criminal prosecutions is marginal at most.*

*Id.* at 621–22 (emphasis in original).[10] Davies' assessment does not justify the conclusion that the costs of the exclusionary rule

---

[9] Davies' research has been reinforced by other studies. See Nardulli, *supra,* note 5, at 598 Table 8, 606 (successful motions to suppress physical evidence occurred in only 0.7% of cases in jurisdictions studied); Uchida & Bynum, *Search Warrants, Motions to Suppress and "Lost Cases:" The Effects of the Exclusionary Rule in Seven Jurisdictions,* 81 J. Crim. L. & Criminology 1034, 1064 (1991) (in jurisdictions studied, where search warrant was obtained only 1.5% of defendants — none of whom were charged with violent crime — went free as a result of a successful motion to suppress physical evidence).

[10] See also Uchida & Bynum, *supra,* n.9, at 1066:

> Our study also provides further evidence that the "cost" of the exclusionary rule in lost cases is slight when the police obtain a search warrant. While critics of the exclusionary rule argue that it imposes a high cost on society by depriving the courts of reliable evidence and allowing criminals freedom, we have found that, in fact, few criminals are freed, and when they are, their crimes are not serious. Thus, the cost to society is limited.

are substantial.[11] Although there are no empirical data on the exclusionary rule's effect in Vermont, we note that from the time of the *Mapp* decision until our decision today, this Court has only once overturned a conviction on the basis of a warrant lacking probable cause. See *State v. Rocheleau*, 131 Vt. 563, 567–69, 313 A.2d 33, 37–38 (1973).

More fundamentally, we are hesitant to label the nonprosecution or nonconviction of felony arrests a cost of the exclusionary rule as opposed to a cost of the constitutional prohibition itself. As former Justice Stewart wrote:

> Much of the criticism leveled at the exclusionary rule is misdirected; it is more properly directed at the fourth amendment itself. It is true that, as many observers have charged, the effect of the rule is to deprive the courts of extremely relevant, often direct evidence of the guilt of the defendant. But these same critics sometimes fail to acknowledge that, in many instances, the same extremely relevant evidence would not have been obtained had the police officer complied with the commands of the fourth amendment in the first place.
>
> . . . The exclusionary rule places no limitations on the actions of the police. The fourth amendment does.

Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-*

---

[11] As others have pointed out, Davies' data represent the costs of the exclusionary rule in all illegal search cases, not just those cases where the police acted in objectively reasonable reliance on a subsequently invalidated warrant. The costs of the exclusionary rule in this particular scenario are necessarily less than the costs of the exclusionary rule in all illegal search cases. As Justice Brennan observed:

> The Court . . . mistakenly weighs the aggregated costs of exclusion in *all* cases, irrespective of the circumstances that led to exclusion, against the potential benefits associated with only those cases in which evidence is excluded because police reasonably but mistakenly believe that their conduct does not violate the Fourth Amendment. When such faulty scales are used, it is little wonder that the balance tips in favor of restricting the application of the rule.

*Leon*, 468 U.S. at 951 (Brennan, J., dissenting) (cross-references omitted) (emphasis in original); see also 1 W. LaFave, *supra*, n.7, § 1.3(c), at 52–53; Wasserstrom & Mertens, *supra*, n.7, at 103–04.

*and-Seizure Cases*, 83 Colum. L. Rev. 1365, 1392–93 (1983).[12] The same can be said about the relative costs of our state exclusionary rule and Article 11's prohibition on unlawful searches and seizures.

There have also been substantial doubts raised concerning the Court's conclusion that excluding evidence seized by a police officer in objectively reasonable reliance on a subsequently invalidated warrant would be of "marginal or nonexistent" benefit in promoting compliance with the Constitution. The Court's notion that there is nothing to deter if a police officer has acted with objective reasonableness is attractively simple. "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon*, 468 U.S. at 921. The exclusionary rule's deterrent effect, however, does not rest primarily on "penalizing" an individual officer into future conformity with the Constitution. Rather, it rests on "its tendency to promote institutional compliance with Fourth Amendment requirements on the part of law enforcement agencies generally." *Id.* at 953 (Brennan, J., dissenting). It creates an incentive for the police as an institution to train its officers to conform with the Constitution. Consequently, the important question is not whether it is of any benefit to "penalize" the objectively reasonable conduct of an individual officer, but rather whether failure to do so will lower the incentive for institutional compliance. The Court gives no answer to this question.

Nor does the Court effectively address concerns that adoption of a good faith exception will create an incentive for future inadequate presentations and magistrate shopping. The Court rejects these concerns as "speculative." *Id.* at 918. Yet this is no answer, because an assertion that such an incentive will not be created is also "speculative" in the absence of empirical data. These concerns do have the force of logic behind them. Because the good faith exception raises the value of having a warrant

---

[12] See also *Leon*, 468 U.S. at 941 (Brennan, J., dissenting) ("it is not the exclusionary rule, but the Amendment itself that has imposed this cost"); 1 W. LaFave, *supra*, n.7, § 1.3(c), at 53 ("The [*Leon*] majority consistently and repeatedly refers to the costs of the exclusionary rule as if they were somehow a matter quite distinct from the Fourth Amendment itself. But this simply is not the case . . . .").

and decreases the subsequent judicial inquiry into the basis for the warrant, the benefits to be gained from magistrate shopping and inadequate presentations are heightened, increasing the incentive to engage in such conduct. See *id.* at 957 (Brennan, J., dissenting) ("[T]he good-faith exception will encourage police to provide only the bare minimum of information in future warrant applications."); *State v. Marsala*, 216 Conn. 150, 169, 579 A.2d 58, 67 (1990) ("the good faith exception would encourage some police officers to expend less effort in establishing the necessary probable cause to search and more effort in locating a judge who might be less exacting than some others"); Wasserstrom & Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am. Crim. L. Rev. 85, 109 (1984) (under good faith exception, "police need concern themselves only with getting a warrant and not with getting a warrant that will hold up on review").

The Court's treatment of the exclusionary rule's effect on the judicial authorities who issue warrants is also suspect. Under *Leon*'s good faith exception, the admissibility of evidence seized by a police officer in reliance upon a warrant will hinge upon the objective reasonableness of this reliance, not upon the lawfulness of the warrant. The good faith exception effectively shields the issuing judicial officer's probable cause determination from subsequent judicial review. The Court suggests that this "may well increase the care with which magistrates scrutinize warrant applications," *Leon*, 468 U.S. at 917 n.18, as it would increase the importance of their task. The obvious rejoinder to this suggestion is that less care may be taken precisely because their determinations will not be subject to review. A further consequence of removing review of the issuing judicial officer's probable cause determination is that there will be less guidance to these judicial officers as to what constitutes sufficient probable cause.[13] Without such guidance, the incidence of mistakes

---

[13] The Court protests that nothing will stop reviewing courts from ruling on the legality of the warrant before moving on to a determination of the officer's good faith. *Leon*, 468 U.S. at 924–25. The answer to this protest lies in the reality of our court system today. "[I]t is unlikely that overburdened trial and appellate courts will take the time and effort to write advisory opinions on fourth amendment law when they can just as easily admit the

by issuing judicial officers will increase. See *Marsala*, 216 Conn. at 169–70, 579 A.2d at 67 ("[O]ur practice of declining to address doubtful constitutional issues unless they are essential to the disposition of a case would preclude our consideration of probable cause beyond reviewing whether an officer had an 'objectively reasonable' belief in its existence."). As stated in Wasserstrom & Mertens, *supra*, at 112:

> [I]t is in close fourth amendment cases that new law is made and guidance to magistrates and the police is most needed. Close cases are both the hardest to decide and the easiest to dispose of under the good faith exception; in such cases the officer's objective good faith is clearest. Thus, these are the cases that defendants are least likely to litigate and the courts most likely to dispose of without reaching the merits of the fourth amendment claim.

The ultimate criticism of the Court's cost-benefit analysis in *Leon* is that it is attempting to do what at this time cannot be done. There simply are insufficient empirical data for the costs and benefits of a good faith exception to be accurately assessed. The benefits of the exclusionary rule are hard to measure because they consist of "non-events." "Police compliance with the exclusionary rule produces a non-event which is not directly observable—it consists of *not* conducting an illegal search." Morris, *The Exclusionary Rule, Deterrence and Posner's Economic Analysis of Law*, 57 Wash. L. Rev. 647, 653 (1982) (emphasis in original); see *United States v. Janis*, 428 U.S. 433, 453 (1976) ("'Since as a practical matter it is never easy to prove a negative, it is hardly likely that conclusive factual data could ever be assembled.'") (quoting *Elkins v. United States*, 364 U.S. 206, 218 (1960)). As demonstrated above, there are conflicting interpretations concerning these benefits and the rule's costs. All of these measurement difficulties are further exacerbated when attention turns from the costs and benefits of the exclusionary rule in general to the costs and benefits of an untested exception to the exclusionary rule.

Even though confronted with these measurement difficulties, the Court remains within its "redoubt of empiricism." *Leon*,

---

evidence under the good faith exception." Wasserstrom & Mertens, *supra*, n.7, at 111.

468 U.S. at 943 (Brennan, J., dissenting). Yet empirical pronouncements without empirical support are not persuasive. Because of the inability at this time to measure accurately the costs and benefits of the exclusionary rule, see *id.* at 942 (Brennan, J., dissenting), we do not find persuasive the Court's conclusions in *Leon* concerning the costs and benefits of a good faith exception to the exclusionary rule.

### D.

The good faith exception adopted in *Leon* represents on its face a significant limitation on the exclusionary rule. "Despite the Court's gradual compression of the scope of the exclusionary rule, no decision prior to *United States v. Leon* expressly contradicted the established principle that evidence illegally obtained was inadmissible in the government's case-in-chief in criminal prosecutions." *State v. Novembrino,* 105 N.J. 95, 138–39, 519 A.2d 820, 845 (1987). Further, it is clear that the exception was intended by the Court to be the rule, not the exception, where a warrant, though invalid, exists. "[S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon,* 468 U.S. at 918. "Our conclusion is that the rule's purposes will only rarely be served by applying it in such circumstances." *Id.* at 926.

We will not impose such a significant limitation upon our state exclusionary rule on the basis of the Court's cost-benefit analysis in *Leon.* Nor have we been persuaded that there are other compelling reasons to do so. See *State v. Brunelle,* 148 Vt. 347, 353, 534 A.2d 198, 203 (1987) (fashioning exception to state exclusionary rule where "defendant has testified during direct examination in a manner contradictory to the suppressed evidence"). The New Jersey Supreme Court, in rejecting *Leon*'s application to its state exclusionary rule, concluded by stating that:

> We see no need in New Jersey to experiment with the fundamental rights protected by the fourth-amendment counterpart of our State Constitution. We will not subject the procedures that vindicate the fundamental rights guar-

anteed by . . . our State Constitution—procedures that have not diluted the effectiveness of our criminal justice system—to the uncertain effects that we believe will inevitably accompany the good-faith exception to the federal exclusionary rule.

*Novembrino*, 105 N.J. at 159, 519 A.2d at 857. We likewise decline to subject the exclusionary rule we have adopted for violations of the Vermont Constitution to such uncertain effects.

Accordingly, the trial court's denial of defendant's suppression motion is reversed.

*Reversed and remanded.*

**Peck, J.**, dissenting. The majority opinion is additional evidence, if any is needed at this point in time, that within the boundaries of the law of search and seizure, the *only* individuals enjoying any constitutional rights recognized by this Court are the criminals. This approach is characteristic of most of the activist-oriented state courts today.

Typical of opinions dealing with suppression is the assertion, express or implied, that, while a criminal may escape the consequences of his crimes by withholding truth from legal scrutiny, the *real* point is that in protecting the criminal, we are also protecting *you*, and you, and you; in other words, "*all* of us."

The courts should know better. If they don't, they need to pause and reflect on who it is they are protecting, not just on paper, but in fact, and whose rights are being ignored, willfully and cynically, when truth is suppressed based on inadequate technicalities.

I do not advocate the complete abolition of the exclusionary rule in search and seizure cases. What I do deplore, and that strongly, is the continuing expansion of the grounds for suppression when the *only* limitation on a warrantless search, under the Fourth Amendment to the United States Constitution and Article Eleven of the Vermont Constitution, is that such searches must not be "unreasonable."

What is reasonable should be a commonsense perception based on an everyday, man-in-the-street understanding, unadorned by the tortured frills, the twists and turns of which only the judicial mind is capable when it struggles to justify a

predetermined result.[1] An understanding of the lay mind is as valid, if not more so, as that of the legal community. Even the law dictionaries speak of "reasonable" in terms of the conduct of a man of ordinary care and prudence. See Black's Law Dictionary 1138 (5th ed. 1979).

Equally disturbing is the indignation being heard from some state courts and legal writers for what they cleverly call the "shrinking Fourth Amendment." It is based in large measure on recent United States Supreme Court decisions. It is for all the world like the sulking of a spoiled child suddenly denied its own way. The truth is, of course, that the Supreme Court is doing no more than putting the brakes on the runaway liberalism which has characterized several decades of judicial thinking, restoring some sense of balance between competing rights and interests in the criminal law.[2]

The bottom line is the continuing refusal of too many state courts to recognize that the "public" is not just an amorphous unidentifiable mass. On the contrary, it is composed of *individuals, as* individuals; the victims of crime, and the victims-to-be. *Their* rights to protection are being violated hourly—now—without concern by the criminal and the courts, even as the majority opinion and this dissent are being written. The majority, once again, proves its inability to either acknowledge or balance both competing rights and interests, hiding behind the smokescreen that it thereby protects all of us! In actuality, the *only* ones who benefit at all from these so-called protections are criminals. It will continue to be so as long as this Court refuses to balance the rights that the noncriminals have, to safety, peace of mind and freedom from fear under Article One of the Vermont Constitution, with the rights of the criminal, per se.

---

[1] In a letter to William Johnson, dated June 12, 1823, Thomas Jefferson (who was nothing if not a liberal) wrote: "Laws are made for men of ordinary understanding, and should therefore, be construed by the ordinary rules of common sense. Their meaning is not to be sought for in metaphysical subtleties, which may make anything mean everything or nothing at pleasure."

[2] We would do well to remember that even the so-called "*Miranda* rule," which we tend to look upon as all but prehistoric in its origin, has been in existence less than thirty years. See *Miranda v. Arizona,* 384 U.S. 436 (1966). It is interesting to note that *four* of the justices dissented; three dissenting opinions were written.

The majority opinion here is reminiscent of the dissent in *State v. Record*, 150 Vt. 84, 90–106, 548 A.2d 422, 425–35 (1988). That case involved a claim by the defendant that the warrantless stop of his vehicle by police at a DUI checkpoint violated Chapter I, Article Eleven of the Vermont Constitution (hereinafter Article Eleven) and, accordingly, the trial court erred in denying his motion to suppress all evidence of intoxication obtained at the roadblock.

In an earlier case, *State v. Martin*, 145 Vt. 562, 496 A.2d 442 (1985), we held that warrantless stops at sobriety checkpoints did not violate the Fourth Amendment to the United States Constitution (hereinafter Fourth Amendment). The defendant in *Record*, however, argued that Article Eleven afforded greater protection than its federal counterpart, and urged us to hold such warrantless stops to be unconstitutional under the Vermont Constitution.

The claim in *Record* was based on the difference in the wording between the Fourth Amendment and Article Eleven. The former prohibits only "unreasonable" searches without a warrant. The defendant argued that under Article Eleven the prohibition against warrantless searches is absolute, since the word "unreasonable" does not appear in the Article.

We concluded that this argument overlooked at least two earlier decisions. In *Lincoln v. Smith*, 27 Vt. 328, 346 (1855), we held that the word "unreasonable" is as implicit in Article Eleven as it is express in the Fourth Amendment. We approved this interpretation as recently as *State v. Badger*, 141 Vt. 430, 454, 450 A.2d 336, 350 (1982). See *Record*, 150 Vt. at 85, 548 A.2d at 423. Thus, the Fourth Amendment and Article Eleven are identical for search and seizure purposes.

The logical progression in reasoning can only be this: warrantless searches and seizures, per se, are *not* prohibited by any fair interpretation of either Article Eleven or the Fourth Amendment. It is *only*—and I emphasize the word "only"—when a warrantless search is *unreasonable* that the prohibition is triggered; it is *only* in relation to unreasonableness that the two provisions have significance. Thus, the first obligation of law enforcement authorities is not *necessarily* to seek a warrant before conducting a search, or to secondguess the judge who issues it when it appears to be proper on its face. The only

obligation, if the authorities decide to proceed without a warrant, is that of reasonableness.

In a situation where no warrant is obtained, the officers, knowingly, take a considerable risk in proceeding without one. I am not so naive as to suggest otherwise; discretion probably remains the better part of valor, particularly when the officers know that a court of unreconstructed activists lies in wait for them. Nevertheless, as the two constitutional provisions are structured, the *initial* inquiry by a reviewing court must *always* be whether the warrantless search was reasonable, i.e., not "unreasonable." If it is held to be reasonable, the inquiry on review of that issue should terminate.

For all practical purposes a defective warrant does not authorize a search any more than no warrant at all; no (legitimate) warrant has issued. The difference lies in the officers' perception of the risks to be taken. Conducting a search in *good faith* reliance on a warrant they are unaware is defective, they are likewise unaware that any risk is being taken. Regardless of perceptions, the initial inquiry remains the same: was the search reasonable?

At this point, I feel it necessary to reprise one of the bases of my dissent in what I continue to regard as one of the worst, most irrational and totally unnecessary opinions issued by this Court. I refer, as any Court-watcher will guess, to *State v. Kirchoff*, 156 Vt. 1, 587 A.2d 988 (1991). That case stamped the Vermont Supreme Court as among the most activist-oriented in the country, out of sync not only with the United States Supreme Court, as the opinion expressly acknowledges, but with many state courts as well, taking its cue primarily from another activist state court while snubbing a recent and sensible ruling by the supreme court of our twin state, New Hampshire.[3]

*Kirchoff* also involved drugs and a warrantless search. This Court, as well as the United States Supreme Court and others, have recognized drunk driving as a major social problem, and

---

[3] An amusing corollary, from a black-comedy perspective, emerging from the *Kirchoff* majority opinion, is its conclusion that a contrary result would be "martial law." I can only conclude that the *Kirchoff* majority doesn't know what martial law is, or that the people of New Hampshire, and a substantial number of other states, are now living under martial law. The wonder is that our eastern boundary in not teeming with refugees from such tyranny.

therefore, DUI roadblocks, that is, stopping vehicular passage without warrants or probable cause, are justified in the interest of the safety and welfare of the legions of individuals who do not "drink and drive," and have the right to drive without risking their lives.

The callous indifference of the *Kirchoff* majority to the plight of those who suffer as a result of drugs, the human wreckage generated among those irredeemably addicted, has its origin in technicalities. The infamy and greed of the dealers and producers, at whatever level, has provided an incentive for the involvement of organized and ruthless crime unequaled since the days of prohibition. Unlike the drunk driver, their crimes are deliberate, planned, organized, and above all, intentional. The unbelievable indifference of the *Kirchoff* majority to the ever increasing crimes of violence, often affecting innocent passers-by, in drug-related crimes, is beyond comprehension. It is inexcusable.

The irony of cases like *Kirchoff*, and today's unfortunate decision, is that they purport to be based on the protection of "individual" rights. What an absolutely farcical distortion of the truth! The majority has learned nothing from such cases as *Record* and *Martin*. The drug problem is every bit as pervasive and against our individual rights as drunk driving, if not more so. In a sense it is worse because it is willful; criminal intent is always present. And yet, the majority cannot, literally, I gather, view the "people" or the "public" as any more than an amorphous, undefinable mass without any identifiable rights as such.

But the "people," the "public," would not exist at all if not made up entirely of individuals; as such, we have a constitutional right to safety under Article One; this includes freedom from the depredations of criminals, including the violence and soul-destroying addictions inherent in the drug problem.

I would not denigrate the rights of property owners, *as* property owners, but one of the ironies involved in protecting those rights is that, as a practical matter, the only individuals who receive any real benefits, as distinguished from the theoretical, are those who use their property for criminal activity. It is apparent that the majority views property used for unlawful purposes as more important than human life and safety.

In the real world, the problems, if any, usually faced by non-criminal property owners are not attributable to police action,

but to some kind of invasive activity by, or disagreement with, other individual laymen, often neighbors or trespassers, legal proceedings of a civil nature: eminent domain, boundary disputes, mortgage foreclosures and others. On the other hand, the police are charged with protecting the safety and well-being of all of us. They have too much to do and too few resources to spend the limited time available in random invasions of private property without an articulable reason or a shadow of suspicion, "just for the fun of it." The implied concern of the majority for "jack-boots at midnight" kicking in the front door, roving "goon-squads" invading arbitrarily and without the slightest reason, is slick legal demagoguery that provides the pretense of a reason for exaggerating a pimple into an Everest which isn't there. The majority, like the famous Keystone Cops of silent-film comedy, are busy scurrying about in pursuit of paper tigers. We have in the recent past demonstrated that we will act quickly and decisively to strike down arbitrary and clearly unreasonable police action by application of the exclusionary rule. See *State v. Emilo*, 144 Vt. 477, 479 A.2d 169 (1984).

In rejecting the good-faith exception, the majority dwells almost exclusively on the economic rationale for the Supreme Court's decision in *United States v. Leon*, 468 U.S. 897 (1984); the critique, however interesting, is irrelevant.[4] The underlying concept of a good-faith exception to the exclusionary rule deserves consideration beyond the limited scope of the *Leon* rationale in Article Eleven cases. I submit that *good-faith* reliance on a warrant that seems to the officers proper on its face, even though a reviewing court subsequently finds a defect, is one of the more obvious and workable grounds for application of an exception. "Good faith" is as much a fact as any other; the courts are no less capable, all of a sudden, of resolving that factual question than any other.

*Martin* and *Record* broke the ice; drug-related crime is as egregious a social problem as drunk driving, if not more so.

---

[4] Moreover, the condemnation by the majority here of another court for a decision motivated in part by economic considerations has a faint odor of the pot calling the kettle black. This Court's recent decision to hear oral arguments in many cases in panels of three justices only, depriving a substantial number of litigants of full-Court review, is based, in part at least, on economics.

Notwithstanding the pious and ridiculous disclaimer by the *Kirchoff* majority, that case and today's decision *does* hamper criminal investigation, and that, seriously; the claim to the contrary is unsupported judicial hype. The Court should be in the vanguard of the war against drugs as it has been in DUI cases; we should respond affirmatively to the needs of public safety, instead of reversing our field and providing aid and comfort to the criminal enemy.

The majority rationale here is supported by the purest speculation and conclusions of the most liberal and activist among the state and lower-court federal judges. Many of them, I note, are dissents expressing frustration and pure pique because there is a moderating trend away from the galloping activism characteristic of judicial decisions for several decades favoring the criminal, while ignoring and increasingly limiting the rights of the people to safety and protection. The same is true of many of the legal writers who "came of age," as it were, under the influence of these decisions to the point that they can no longer think independently at any other level.

I read in the majority opinion an isolated quotation to the effect that the

> "[i]ntroduction of [illegally obtained] evidence at trial eviscerates our most sacred rights, impinges on individual privacy, perverts our judicial process, distorts any notion of fairness, and encourages official misconduct."

Quoting *State v. Badger*, 141 Vt. at 453, 450 A.2d at 349 (brackets added in the majority opinion).

This quote, as it is used, is demagoguery carried to the extreme. The facts in *Badger* are miles removed from this case. In fact, it is questionable that the "seizure" was in fact illegal at all. The clothing of the defendant, who was 16 years old at the time, appropriated by the police, was not taken directly from the defendant; on the contrary, it was given by the defendant to his father without any limitation as to what disposition the latter was to make of it. The father turned the items of clothing over to the police voluntarily; there was no "forcible dispossession." We sustained the earlier seizure of defendant's blood-stained shoes on the grounds that defendant might otherwise destroy them. It makes no sense to suggest that the clothing could not have been destroyed as readily as the shoes. It makes

no sense either to tie the clothing to defendant's allegedly involuntary confession, as "fruit of the poison tree," without reaching the same conclusion in regard to the shoes. But, in any event, to say the confession "tainted" the legality of accepting the clothing is no more than manipulation to justify the result.

I admit, with some embarrassment, that I joined the decision in *Badger* in its totality. I would not do so today. I can only plead that I have matured in judgment since then, and to appreciate more readily the practical need to balance certain underlying rights when there is a potential conflict. Cf. *Record*, 150 Vt. at 87, 548 A.2d at 424. Shakespeare seems to have words or phrases applicable to almost any situation; helping me explain my bad judgment in approving *Badger*, he has not failed me. In *Anthony and Cleopatra*, I, v, the latter, being reminded that she has changed her mind concerning an earlier view, answers that her prior thinking was in "My salad days/When I was green in judgment."

*Our* most sacred rights? Whose rights are we talking about? This is solid evidence that the majority is unable to interpret the word "individual" as referring to anyone other than defendants. Once a police investigation of a crime is initiated, the *only* "individual" who is recognized as having any rights is the person ultimately accused, to say nothing of the continuing expansion of what is included in those rights by playing games with the state constitution. The majority is *totally* blind to the victim of a case sub judice, as well as the victims-to-be of crimes in the future. The courts will do nothing, almost literally, that will serve to *deter* crime, and protect us against its unholy machinations. They are unable to consider whether a decision made today will jeopardize the rights of the people or impede law enforcement down the road of tomorrow.

The primary basis for this unacceptable approach to justice is the parallel inability of the appellate mind to accept or understand the fact that the words the "public," the "people," have any meaning which can be defined in terms of rights. The Court has either forgotten that Article One exists, or doesn't quite know what to do when confronted with two constitutional provisions that may not be entirely consistent. Ergo, it selects one, goes into a formulaic judicial tizzy, and tosses the other out the window of its ivory tower and into the murky moat of forgotten

things below. It is the disregard of the rights we all have as individuals, per se, on which the majority, repeatedly, turns its back. The majority refuses to balance the two sets of rights, notwithstanding the holding in *Record* that such a procedure should be followed.

The opinion speaks of the inadmissibility of "illegally" obtained evidence. That is bad logic; it begs the question. It assumes one of the main premises: illegality. I noted above that the acquisition of evidence, however accomplished, becomes illegal only if the search itself is unreasonable. Considering this, the real issue here is, in part, whether a search, based on the good faith reliance by the police, on a warrant, proper on its face, but subsequently determined to be defective is "unreasonable."

I see nothing to render a good-faith search without a warrant necessarily unreasonable under either constitution. The predictions, adopted from dissenting opinions in *Leon*, have no supporting empirical evidence. They are, therefore, pure speculation and unsupported conclusions. They sink to the level of police bashing by the judiciary, so currently in fashion. The police are heroes when they are needed, often putting their lives in jeopardy, or risking serious injury (a number of officers are killed and injured in line of duty every year), but when they are not responding to a need, they are frequently the subject of criticism — bashing, in short; usually generalities inspired by sensational, albeit unfortunate exceptions. Lines from "Tommy" by Rudyard Kipling, which compares the public reaction to British soldiers in times of peace and war, are often applicable to the police as well:

> For it's Tommy this, an' Tommy that,
> An' "chuck him out, the brute!"
> But its "Saviour of 'is country" when
> The guns begin to shoot;

I am not unmindful that "rogue-cops" do surface from time to time. When that happens, their conduct tends to blacken unfairly the police image everywhere. Nevertheless, law enforcement officers at all levels are, on the whole, diligent and sincere; they act, for the most part, in good faith in their efforts to protect our lives, safety and property, when needed. I regret they must be subject to criticism by, of all sources, the courts.

As I noted above, the majority's quote from *Badger assumes* the disputed evidence in this case *was* illegally obtained. This must be so, else the quotation is employed in a vacuum and is meaningless here. I contend, however, that the search was not illegal because it was reasonable.

I agree that "our" most sacred rights are indeed being eviscerated, but not in the sense proposed by the majority. I have argued earlier that in the criminal law there are *two* distinct classes of rights which are *always* involved, those of the accused and those of the public.

*Both* classes are entitled to constitutional protections. For purposes of the law generally, as applied to a particular case, the "our" should refer to all of us who had no guilty involvement in the crime; this includes the immediate victim(s), victims-to-be, i.e., those among us who will become the victims of similar crimes hereafter, notwithstanding their constitutional right to safety, and even the accused to the extent he is not only presumed innocent, but is *innocent in fact*.[5] Finally, I include in the "our" all the people; those considered as individuals, who have never been, and (hopefully) never will be, victims of a crime. Every single individual has a constitutional right to safety, peace of mind, freedom from fear, and to enjoy their property, real and personal, for all *lawful* purposes, without the incursions of criminal activity. Every one of us has a right to walk the streets, alone if we see fit to do so, at night as well as during the day, in peace, without being molested or harassed.

It is the above-described rights which are being "eviscerated" by the courts with decisions like *State v. Brunell*, 150 Vt. 388, 554 A.2d 242 (1988), and *Kirchoff* (an omen of darker days to come for "our" rights; prophetic of today's horror and, I predict, others yet to come). Like Mary Shelley's Frankenstein, the Court, in its inexcusable and ill-advised activism, has created a monster which lumbers unchecked among our rights, tearing and "eviscerating" at will. Unlike hapless Frankenstein, however, the majority labors to enhance the destructive powers of its creation rather than to control it.

---

[5] I stress the phrase "innocent in fact." A defendant may be guilty (in fact) even though acquitted by the trier of fact, because, in the judgment of the latter, the prosecution was unable to establish guilt beyond a reasonable doubt.

And what is this claim by the majority that the search in this case "impinges" on ["Our" right to] individual privacy? Excuse me; *whose* right to privacy? Certainly not "ours." There is no danger, except through unrealistic theorizing about warrantless searches being undertaken for no reason at all. Where are the examples of such wild intrusions, or the evidence that there is a legitimate danger to be feared? The majority provides none.

The *Kirchoff* majority said, in effect, it is far better that criminals "get away with it," than to invade their privacy. This wooly-headed thinking is repeated by the majority here. In short, the majority has announced a right of privacy to commit crimes; the official stamp of approval is on the proposition that it is socially acceptable to commit a crime, as long as you don't get caught at it; the Court recognizes your right to commit crime on your own property, and will cooperate with you in any criminal activity you choose to undertake on your land by protecting your privacy against warrantless searches. This judicial doctrine brings us full circle back to the position that if a warrantless search is reasonable it is not constitutionally prohibited; it is not forbidden absolutely, privacy rights notwithstanding. This, in turn, returns me to the preceding paragraph, arguing that the threat of routine warrantless invasions into the property and privacy of the law-abiding is an unrealistic and deplorable fantasy.

The majority does not say how the search in this case "perverts our judicial process." Aside from the fact that it has a nice, legal-sounding ring to it, I fail to see its application to this case. The only perversion here, as in *Kirchoff, Badger, Brunell,* et al., is the Court's ongoing refusal to recognize "people" as made up of individuals, and ignoring their rights out of existence to the point they are not even entitled to be balanced against competing rights. *Record* and *Martin* are now to be regarded as quaint aberrations to the extent they stressed the importance of balancing in criminal cases.

We should all realize that defense motions to suppress evidence in criminal cases are almost always designed for one purpose only: to withhold from the jury an inculpatory *fact*; an item of *truth* which may, and probably will, have an adverse effect on the defense if admitted. If this were not so, such a motion would be pointless.

A criminal defendant is entitled to a fair trial, but the suppression of evidence embodied in a relevant fact does not impinge on the fairness of the trial one way or another. A criminal trial, as such, is never "unfair" to the defendant simply because *all* the relevant inculpatory evidence is placed before the jury. If he was the actual perpetrator of the crime, he is no less guilty-in-fact, nor is the evidence any less true or relevant because obtained by a warrantless search. Suppression of evidence is designed to restrain *unreasonable* warrantless searches and seizures by the police; it is a punitive device imposed on governmental enforcement authorities to curb abuses. It can be a powerful deterrent in the implementation of its purpose. Nevertheless, if the imposition of the exclusionary rule proves a benefit to a defendant, by eliminating otherwise legitimate evidence against him, it is a secondary and incidental benefit not related to the fairness of his trial, per se, one way or another.

In the case before us, assuming arguendo that the warrant was entirely proper (as, indeed, I believe it was), its admission into evidence would have been entirely proper and consistent with the fairness of the trial, regardless of its adverse consequences to defendant's case. Moreover, the full panoply of the truth, ergo, the *whole* truth, would not be withheld from the jury; the case as it really was would be before the jury for its consideration. If a fair trial is a double-edged sword, contemplating a full disclosure of *all* the facts, the suppression rule operates against the fairness due the people, even though it is justified in an extreme case as a consequence of the balancing process.

Addressing the final point that admission of the challenged evidence would encourage official misconduct, its application here, and generally, for that matter, is not supported. It is an example of judicial police bashing and speculation. Ultimately it is based on the tiresome question: "How would *you* like a policeman walking into *your* house in the middle of the night without a warrant and start searching the place?" Such a question recognizes that most people do not commit crimes, and that the police have not the slightest reason to suspect the contrary. The question lies at the root of the claim that, in protecting the criminal, the courts are, in reality, protecting the innocent in

their right to privacy. In reality, it is a trick question which contains its own self-evident answer: of course I wouldn't like it, no one, guilty of something or not, would like it.

When we blow away the smokescreen, however, the question is seen for what it is: simplistic and naive. Being unable to see the "woods" of society as a whole, for the "trees" of the individual criminals who stand before them, all too many state courts continue their abandonment of responsibility to the people; they are incapable of visualizing society as made up of individuals, concentrating on the more heady, glamourous and prestige-building pastime of hampering law enforcement and removing obstacle after obstacle from the practice of crime.

Granting that no one relishes the idea of the police arbitrarily invading their homes, ask also how many, *not* involved in criminal activity, who retire at night, leave their homes unoccupied while at work during the day, or while they are away for some purpose during the evening, or for longer periods on vacations, how many of these are filled with continuing apprehension that the *police* will just drop in unexpectedly for a friendly little search? Ask those who lock their doors at night or when they are away, install alarms and other security devices, why they do so. Ask the same question of banks, stores, and other businesses, and why many of them, who are big enough to justify it, employ their own night watchmen and other security personnel. Will anyone reply that these precautions are taken to secure the premises against unwarranted invasions and searches by the police? Even the majority must acknowledge that no one, other than criminals, fears, or has any reason to fear "official misconduct" in this respect.

Regardless of the above, the majority wave Article Eleven triumphantly, boasting that it has taken one more step to deter police abuses, quoting, en route, all the gods of activism it can put its hands on. But the criticism of the *Leon* rationale is not justified because it is irrelevant. We are talking about good-faith exceptions, per se, not the rationale which one particular court employed in one case.

The criticism of the good-faith exception, per se, is invalid for several reasons. The opinion refers to any loosening of Article Eleven restrictions as "deconstitutionalizing" (take a minute to absorb that one! No wonder laymen are baffled by legalese!).

Notwithstanding my enthusiasm for this grand new word, it isn't enough to obscure the fact that deconstitutionalizing is exactly what the majority has done. It has "deconstitutionalized" Article One right out of our Constitution by ignoring it without reference, and ignoring *Record* as well, in which we not only recognized the importance of Article One, but we expressly *approved* a similar type of police conduct so unalterably condemned by the majority in both *Kirchoff* and the instant case. It seems almost unbelievable that any creditable appellate court would thus disregard its own precedential decisions (*Record*) less than three years old; what price stare decisis?

It is inexcusable, and I cannot condone with any respect, an appellate decision which concerns itself with only one aspect of a case in order to accommodate a specific result. Plain and simple justice, to say nothing of common sense, should be more than enough to convince any court that competing *rights* should be subjected to a balancing examination and neither one of them swept in silence under the carpet.

The majority demonstrates that it will demean the interests of justice and common sense by continually piling one device upon another. It argues with great piety that it is acting solely to deter police misconduct in undertaking warrantless searches, as if the practice was running out of control. At the same time it turns a contemptuous back on any new measure that might serve to deter *criminal* activity, which *is* virtually out of control. But perhaps I should realize that this is getting to be par for the course.

Reprising the essence of this dissent, the opinion is clear evidence that the majority is incapable, or inexcusably unwilling, to recognize that in every criminal case there are *two* separate and distinct sets of constitutional rights involved. Both of them involve *individual* rights; they may, and often do, conflict with each other. In no other concern of the criminal law is this dualistic aspect of rights more clearly illustrated than in search and seizure cases. The first of these rights are those of the accused (defendant), as such, to protection against *unreasonable* searches and seizures under Article Eleven. The second set of individual rights, of equal importance nonetheless, are those rights of every individual to the safety of his person and property against criminal activity, as well as to peace of mind and

freedom from fear, all under Article One of our state Constitution. Cf. 42 U.S.C. § 1983.

Whenever these two rights collide or conflict in a particular case, and cannot be reconciled, the courts have an obligation, and I believe it is a *moral* obligation as well as a duty, to *balance* these conflicting rights. *Record* is a strong, recent, and clearly expressed precedent, in which this Court stated its obligation to balance these rights when they conflict. In *Record* we stated:

> [R]easonableness [under Article Eleven] . . . depends "on a *balance* between the public interest and the individual's right [to be] free from *arbitrary* interference by law officers." [150 Vt. at 87, 548 A.2d at 424 (emphasis added, citation omitted).]

Notwithstanding this unqualified precedent, and my insistence that the Court should do so, the majority in *Kirchoff refused* absolutely to apply a balancing test; indeed, it refused even to refer to it; denying it even lip-service, relying, no doubt, on the hope that "if we ignore it, it will just go away." The same baffling refusal is repeated in today's decision.

I simply cannot understand, "for the life of me" (to express my bewilderment and frustration in the colloquial), *why* the Court continues its adamant refusal to apply a balancing test when conflicting rights are involved. It is inconsistent with our own precedents such as *Record,* and *Martin,* and other cases as well, such as *State v. Brunelle,* 148 Vt. 347, 534 A.2d 198 (1987), and *Badger* in which public concerns are at least recognized. But we are concerned here with the reasonableness of a search; that *depends on a balancing* of (1) privacy interests with (2) the need to protect the public. *United States v. Rabb,* 752 F.2d 1320, 1323 (9th Cir. 1984).

There are few offenses more serious, from the point of view of the public welfare, than those which are drug-related. There can be no doubt whatever that drug-related crime is no less a social menace than drunk driving. There is also clear evidence that drug abuse is frequently a gateway to the presently incurable disease AIDS, which, experts anticipate, may well reach epidemic proportions. Traffic in drugs carries in its devastating wake more violence and other collateral offenses than any other crime I can think of. Finally, criminal *intent* is *always* present, which is rarely, if ever, a factor in drunk driving cases where

injury or damage results. To argue that drug-related crime is not one of the most egregious offenses known to modern society, or less of an offense than DUI, is nothing but tunnel vision and illogical.

I challenge anyone to provide a logical reason to support the majority's position that the balancing test is appropriate in DUI cases but not in drug-related cases. Wherefore the discrimination, majority? It makes no sense; it cannot be justified on any conceivable basis.

When balancing is applied, as it should be here, and as it should have been in *Kirchoff*, the "reasonableness" of the search in this case becomes a factor, since a defective warrant is the equivalent of no warrant at all.

A word must be said concerning the majority's approach to this factor. The Court is in the enviable position of having the power (note I do not concede the right) to call *any* search unreasonable, however arbitrary such a decision may be. Assuming a particular search is called unreasonable when it is not, and reasonableness should be gauged by a layman's common sense rather than legalistic gamesmanship, the result is an abuse of power.

It is possible here that the majority is more at fault by adopting a philosophy, in search and seizure cases, that constitutions must *always* be construed to favor an accused, regardless of any other rights that may exist. This is biased thinking in cases like this one and in *Kirchoff*, *Brunell*, and (in part) *Badger*, where the actor-in-fact is known, and the issue presented revolves around a technicality, as distinguished from those cases in which the prosecution is based on the uncertainties of purely circumstantial evidence. Such treatment is also inconsistent with *Record* and *Martin*.

Virtually all the quoting in the majority opinion is one-sided and from sources generally recognized, with approval or otherwise, as activist oriented. Most of them are extremely speculative and, to the extent they strike us as impressive, it is because other sources to the contrary are not discussed in any depth. There are two of these sources, however, which I do wish to address briefly.

The first suggests that better training of the police will alleviate many of the Fourth Amendment (and, accordingly, Article

Eleven as well) problems. The majority opinion appears to accept this suggestion. Notwithstanding the great respect in which we all hold the author of this proposal, I disagree; I think it is wishful thinking and nonsense. It would require that every police officer be somehow trained in the constitutional law and the rights of all concerned, to a level of expertise equal to the judges who decide the questions, or at least of the attorneys who prosecute and defend in criminal cases.

This case is a good example of the problem. One judge concluded there was sufficient grounds and issued a warrant. A second judge felt otherwise and suppressed certain evidence. I submit it is unfair and unreasonable as a practical matter to expect all police officers to be trained to the level of constitutional lawyers. Moreover, in Vermont, we are talking about rural officers in small communities, as well as part-time police, traffic control officers and others whose experience with complex constitutional problems is rare at best. In my view the training of police to the level implied by the suggestion is simply not feasible.

I find the majority's quote from Justice Stewart ironic in its truth:

> It is true that, as many observers have charged, the effect of the rule is to deprive the courts of extremely relevant, often direct evidence of the guilt of the defendant. But these same critics sometimes fail to acknowledge that, in many instances, the same extremely relevant evidence would not have been obtained had the police officer complied with the commands of the fourth amendment in the first place.

This quote illustrates my concerns perhaps as well, if not better, than a more affirmative citation. I might precede my discussion of this quote by noting that it distinguishes between the exclusionary rule and the Fourth Amendment. I acknowledge the distinction, but feel, nevertheless, for practical purposes, it is pretty much a distinction without a difference as far as the end result is concerned.

The federal exclusionary rule is a child of the Fourth Amendment, as Vermont's own exclusionary rule is an offspring of Article Eleven. If it were not for these constitutional provisions, it is doubtful that there would have been an exclusionary rule, at

least as we know it today, to the extent that searches and seizures are involved. It would be like postulating a child without a father or mother.

And it is true, as Justice Stewart pointed out, and as it applies here (*assuming* Article Eleven *was* violated and a good-faith exception to the rule is rejected), the trial court is now deprived of direct and relevant inculpatory evidence, i.e., the *truth*. It is also true that the evidence would probably not have been obtained at all if Article Eleven had not been violated. Considering this second sentence, it "fails to acknowledge" that if a good-faith exception, carefully but more reasonably monitored by the court, is recognized, the cases to which this sentence applies might be lessened considerably and *all* the facts exposed to the sunlight of the truth.

In either case, if a successful prosecution is no longer possible, as well may be the case here, the majority has once again cooperated with the criminal element by ignoring and refusing to balance other legitimate constitutional rights, thereby condoning and cooperating in another violation of the anti-drug laws.

The quotation from Justice Stewart illustrates my concern for the refusal either to balance or to adopt a good-faith exception. The majority builds on it by visualizing certain unfortunate consequences resulting from the adoption of the exception. Without addressing each of them separately, overall they postulate a lazy indifference on the part of judges, prosecutors and the police. I see this as an unwarranted insult to the integrity of our public officers in which I cannot join. Moreover, as I noted earlier, good faith is a question of fact as much as any other; it requires adequate supporting evidence and can be controlled by the courts—ultimately by this Court—to the same extent as any other evidentiary issue. This Court is not as ineffective and helpless as the majority tries to make it appear.

Finally, the majority contends that Article Eleven reaches behind police conduct, and therefore the exclusionary rule embraces defective warrants as well as the conduct based thereon, regardless of good faith on the part of the police. That is twice flawed. The exclusionary rule is designed as a punitive measure to deter *police* misconduct, regardless of the majority's effort to extend it. "[T]he primary function of the exclusionary rule is

to deter law enforcement officials from future unlawful conduct." *Rabb*, 752 F.2d at 1323. Rejecting the good faith exception, the majority virtually *assumes* bad faith, negligent error, or conspiracy with the police on the part of the issuing magistrate, whereas "good faith" addresses only good faith *reliance* on a warrant that *appears* proper to the police. These are all questions of fact to be resolved in determining whether the reliance was, in *fact*, in good faith. This determination would include the *reasonableness* of the police perception of the warrant as being valid. Again, we are talking about serious crime and those instances where the offender is *known* as a fact.

Secondly, defective-warrant cases are substantially less frequent than warrantless searches, per se, in which judge participation is not involved at all in the first instance—as, for example, in *Kirchoff*, *Badger*, and the DUI roadblock cases. *Warrantless* searches and seizures are the veritable target of Article Eleven. Defective warrants come within its scope only because, technically, they are not warrants at all, any more than a blank sheet of paper. They are subject to review only in the process of determining whether reliance thereon by the police was reasonable and in good faith.

The majority concedes that its calamity-howling is speculative, and without empirical support. This can be said of any new rule created by judicial fiat. It is ironic that when new judge-made law serves to relax the burden of criminal defendants and ease the difficulties of committing offenses against the people, they are greeted understandably with great enthusiasm by the defense community. On the other hand, when a new proposal appears on the horizon that will help to *deter* criminal activity, the activist cavalry calls the muster roll, and comes galloping over the ridge to the rescue with sabers drawn, guidon snapping bravely in the wind, and its bugle sounding the charge, all in a manner the unhappy George Custer would have welcomed at the Little Big Horn.

The benefits of a good-faith exception may also be speculative to a degree, but that is no justification for rejecting it, any more than were the dissenting predictions in *Miranda*. The exception could be a breath of fresh air of hope in the war against drugs, as was *Record* in the struggle against drunk driving. In my judgment, any abuses *can* be controlled by this Court.

The failure of the majority to balance, or even consider competing constitutional rights in reviewing this appeal, is an "about face, to the rear march" slap at the progress made in *Record* against the long-standing favoritism on behalf of those who choose, deliberately and intentionally, to violate the laws which are designed to protect the Article One rights of all of us' as individuals. In their place, the majority remains firmly entrenched behind an interpretation of the laws which benefits *only* criminal activity. It is little wonder that we hear, increasingly, cries of public outrage at the slavish and unnecessary obeisance of many state courts to technicalities which demean our rights and ease the path of the transgressor. The crime rate is all but out of control and rising. The courts must share the responsibility to a significant degree by their indifference to human suffering, and the impenetrable shield they raise, against common sense and reason, in favor of the "rights" of criminals (many of which are in fact court created), without any recognition or balancing of the rights of society. The courts have much to answer for.

The good-faith exception need not be justified on an economic basis alone, as in *Leon*. It is a desirable and controllable device which would help to deter rather than encourage crime. There should be a balancing of rights. The failure of the majority is contrary to clear precedent and against the public interest. Included in that balancing should be the exception. It should be adopted.

