## State of Vermont v. Steven R. Lussier, Jr.

## State of Vermont v. Robert R. Lussier

[757 A.2d 1017]

Nos. 98-394 & 99-017

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed April 28, 2000

Motion for Reargument in No. 99-017 Denied June 12, 2000

*Dale O. Gray*, Caledonia County State's Attorney, and *Alan M. Singer* and *Robert Butterfield*, Deputy State's Attorneys, St. Johnsbury, for Plaintiff-Appellee.

*David C. Sleigh* of *Sleigh & Williams*, St. Johnsbury, for Defend-ants-Appellants.

**Johnson, J.** Defendants in these two consolidated cases appeal the civil suspension of their driver's licenses. At issue is whether the district court in a civil suspension proceeding may consider the constitutionality of the underlying stop, and, if so, whether the stops in these two cases were lawful. We hold that a defendant in a civil suspension proceeding may challenge the reasonableness of the underlying stop pursuant to 23 V.S.A. § 1205(h)(1), which permits the court to consider whether the police officer had reasonable grounds to believe that the defendant was driving while intoxicated. This inter-

pretation of § 1205(h)(1) is consistent with our belief that the exclusionary rule's ban against the admission of unlawfully obtained evidence should extend to civil suspension proceedings to protect the core value of privacy embraced by Chapter I, Article 11 of the Vermont Constitution. Examining the stops in the two cases before us, we conclude that defendant Steven Lussier was lawfully stopped for operating a motor vehicle with only one functioning taillight, but that defendant Robert Lussier was unlawfully stopped for operating a vehicle with only one functioning rear license plate light.

There is no dispute as to the facts in either case. Defendant Steven Lussier was stopped at 2:49 in the morning on June 28, 1998 by a police officer who observed that his passenger car's right taillight was inoperable. Upon stopping the vehicle, the officer noticed signs of intoxication and ultimately processed defendant for driving while intoxicated (DWI) after he failed to satisfactorily perform field dexterity tests. Defendant agreed to a breath test, which revealed a blood-alcohol concentration of .152.

At his civil suspension hearing, defendant argued that because Vermont statutory law requires only one functional taillight on passenger cars, the officer had no reasonable basis for stopping him. The district court rejected this argument, concluding that Vermont law requires that each and every taillight on a motor vehicle be in good operating condition. On appeal, defendant renews his argument that there was no reasonable basis for the stop of his vehicle because Vermont law requires only one functioning taillight.

In the second case, defendant Robert Lussier was stopped at 1:18 in the morning on November 29, 1998 by a police officer who observed that one of the two white lights intended to illuminate his truck's rear license plate was inoperable. Upon stopping the vehicle, the officer noticed signs of intoxication and ultimately processed defendant for DWI after he was unable to perform field dexterity tests. Defendant agreed to a breath test, which revealed a blood-alcohol concentration of .140.

At the civil suspension hearing, defendant argued that because Vermont statutory law requires only one light to illuminate the rear license plate, the officer had no reasonable and articulable basis for stopping his truck. The district court concluded that the stop was justified by the inoperable plate light, and that in any event the issue concerning the validity of the stop was not one of the limited issues enumerated in § 1205(h) that may be raised in civil suspension proceedings. On appeal, defendant contends that there was no

reasonable basis for stopping his truck because Vermont law does not require two functioning rear license plate lights, and his plate was adequately illuminated.

The parties in both cases requested and received permission to incorporate into their appeals the briefs in two other appeals pending before this Court, *State v. Nickerson*, 98-530 and *State v. Rash*, 98-531. The principal issue raised in those appeals is whether the exclusionary rule's ban against the admission of unlawfully obtained evidence should be applied in civil suspension hearings.

## I.

Before considering whether the stops in the instant cases were lawful, we must consider whether a defendant in a civil suspension hearing may challenge the reasonableness of the underlying stop.

## A.

Under 23 V.S.A. § 1205(h)(1)-(5), the issues at a final civil suspension hearing are limited to the following:

(1) whether the law enforcement officer had reasonable grounds to believe the person was operating, attempting to operate or in actual physical control of a vehicle in violation of section 1201 of this title;

(2) whether at the time of the request for the evidentiary test the officer informed the person of the person's rights and the consequences of taking and refusing the test . . .;

(3) whether the person refused to permit the test;

(4) whether the test was taken and the test results indicated that the person's alcohol concentration was 0.08 or more at the time of operati[on] . . ., whether the testing methods used were valid and reliable and whether the test results were accurate and accurately evaluated . . .;

(5) whether the requirements of section 1202 of this title [consent to taking of tests to determine blood alcohol content] were complied with.

According to the State, because the limited issues enumerated in § 1205(h) do not explicitly include whether reasonable grounds existed for the stop, the Legislature must not have intended to allow

defendants in civil suspension proceedings to challenge the constitutionality of stops. See *State v. Pollander*, 167 Vt. 301, 308, 706 A.2d 1359, 1363 (1997) (Legislature intended to limit issues that may be presented in civil suspension hearings to those enumerated in statute). In the State's view, the reasonableness of the officer's belief that the defendant was driving while intoxicated, see § 1205(h)(1), may be satisfied solely on evidence of intoxication gathered after the stop — odor of alcohol, watery eyes, slurred speech, failure to perform dexterity tests, etc. — regardless of the lawfulness of the stop itself.

■■ We are not persuaded by the State's argument. Our primary duty in construing a statute is to discern the intent of the Legislature by examining the language of the entire statute, along with its purpose, effects, and consequences. See *Candido v. Polymers, Inc.*, 166 Vt. 15, 17, 687 A.2d 476, 478 (1996); *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996). While the Legislature plainly intended to expedite the adjudication of civil license suspensions, see *State v. Strong*, 158 Vt. 56, 61, 605 A.2d 510, 513 (1992), it was careful to ensure that all of the rights related to the taking of a blood or breath sample applied equally in both criminal and civil DUI proceedings. We find it unlikely that the Legislature intended to retain these statutorily created rights in civil suspension proceedings while stripping defendants in those proceedings of their constitutionally protected right to be free from unreasonable stops. Rather, we conclude that, in permitting defendants in a civil suspension proceeding to dispute whether the processing officer had reasonable grounds to believe that the motorist was driving while intoxicated, the Legislature assumed that a constitutional stop would be a necessary predicate to finding "reasonable grounds" for suspicion of DUI. Nothing in the language of § 1205 or the purpose behind the statute suggests that the Legislature intended otherwise.

Section 1205(h)(1) permits defendants in civil suspension proceedings to challenge whether the arresting officer had reasonable grounds to suspect a DWI violation. When a motor vehicle stop is based on an officer's suspicion that the driver was intoxicated, the issue of whether the officer had reasonable grounds to suspect a DWI violation is logically extended to the question of whether there was a reasonable basis for the stop. It would make little sense, however, to allow defendants to challenge the legality of the underlying stop only in situations when the officer indicated that the stop was based on a suspicion that there had been a DWI violation. In determining the legality of a stop, courts do not attempt to divine the arresting

officer's actual subjective motivation for making the stop; rather, they consider from an objective standpoint whether, given all of the circumstances, the officer had a reasonable and articulable suspicion of wrongdoing. See *State v. Sutphin*, 159 Vt. 9, 11, 614 A.2d 792, 793 (1992). It is conceivable that officers might stop individuals for minor vehicle violations based on a suspicion of DUI, perhaps because the individuals have a prior history of DUI in the community or because of other circumstances, such as the time of night or the location of the vehicle.[1] The point is that the subjective motivation of the officer is not the basis for determining the legality of a stop, and thus the issue of whether a stop was legal should not be excluded from determining whether the officer had reasonable grounds to suspect a DUI violation, simply because the stop was ostensibly made on grounds other that DUI.

Hence, a rational interpretation of § 1205(h)(1) would permit defendants to challenge the reasonableness of the officer's belief based on the fact that it was derived from an unlawful stop. The State seeks a more narrow interpretation, however, which would permit law enforcement officers to make random stops of vehicles for any or no reason at all in the hopes of detecting drunk drivers. Indeed, under the State's interpretation of the statute, roadblocks could be set up without regard to the carefully considered strictures set forth in *State v. Martin*, 145 Vt. 562, 571, 496 A.2d 442, 448 (1985), and adopted under Article 11 in *State v. Record*, 150 Vt. 84, 88, 90, 548 A.2d 422,

---

[1] The cases before us involve two brothers who both had prior DWI violations in the small community in which they lived, and who were both stopped in the wee hours of the morning for relatively minor motor vehicle violations. Of course, we cannot know the actual motivation of the arresting officers, and we do not mean to suggest that their motivation in these cases was other than that stated in their affidavits. We merely point out that the underlying motivation of the officer cannot be known, and therefore is not the focus of the court's inquiry into whether the stop was legal.

The Chief Justice states that since the defendants in the instant cases each had a BAC exceeding .08 at the time that they were stopped, "one would have to suspend the laws of probability to believe — as the majority apparently does — that Vermont law enforcement officers are making investigatory stops of drivers 'for any or no reason whatsoever.'" Chief Justice Amestoy's dissent, 171 Vt. at 42, 757 A.2d at 1033. We fail to grasp the logic of this statement. The fact that the defendants turned out to have a BAC exceeding .08 tells us absolutely nothing about the basis of the stops involved or whether law enforcement officers in Vermont make unlawful stops on occasion. More importantly, we make no judgment as to the extent Vermont law enforcement officers make unlawful stops; rather, we decline to construe Vermont law in a manner that would strip Vermonters of their constitutional right to be free from unwarranted governmental intrusion into their private affairs. See *State v. Savva*, 159 Vt. 75, 86, 616 A.2d 774, 780 (1991) (Article 11 protects everyone, particularly law-abiding citizens).

425, 426 (1988). License suspensions could follow the unlawful police conduct as long as at any point after the stop the officer formed a reasonable belief that the defendant was intoxicated. We cannot conceive that the Legislature intended to insert into the civil suspension system all of the statutory rights concerning consent to evidentiary tests, see § 1205(h)(5), and at the same time to dispense with basic constitutional protections against unreasonable governmental intrusions. Accordingly, we decline the State's invitation to attribute to the Legislature the intent to sanction unconstitutional police conduct in the context of civil suspension proceedings. See *Williams v. Ohio Bureau of Motor Vehicles*, 610 N.E.2d 1229, 1231 (Ohio Mun. Ct. 1992) (in creating civil suspension system, legislature did not change DWI laws so as to abrogate drivers' constitutional rights; lack of constitutional stop vitiates right to request compliance with implied consent law).

We recognize, as Justice Skoglund points out, that in creating the civil license suspension system ten years ago, the Legislature intended to fashion a speedy and summary proceeding that would protect the public by quickly removing potentially dangerous drivers from Vermont highways. See *Pollander*, 167 Vt. at 307-08, 706 A.2d at 1363; *Strong*, 158 Vt. at 61, 605 A.2d at 513. But Justice Skoglund's concern that allowing defendants in civil suspension proceedings to challenge the constitutionality of stops will undermine the Legislature's intent in this regard appears to be unfounded. Apparently, in the ten years since the creation of the civil suspension system, at least some of the trial courts in such proceedings have been considering the constitutionality of stops without undermining the system. See, e.g., *State v. Flynn*, 164 Vt. 637, 638, 674 A.2d 792, 793 (1996) (reversing district court's ruling in civil suspension proceeding that underlying stop was unlawful). Yet, the State is not claiming that undue delay has resulted in the past from permitting defendants to challenge the constitutionality of stops in civil suspension proceedings.

Moreover, as noted, while the Legislature sought to avoid the significant delay that often occurs during the criminal DWI process, it was also careful to ensure that all of the statutory rights related to the taking of evidentiary tests applied in both proceedings, and that defendants could challenge civil suspensions based on issues concerning their statutory rights. Of all the issues litigated in civil suspension proceedings, perhaps the easiest and least time consuming is whether the stop was based on reasonable suspicion of unlawful activity. In most cases, the State can meet its burden by submitting the investigating officer's affidavit stating the reasons for the stop.

We also note that the licenses of repeat DWI offenders are suspended upon notice before the final hearing regardless of what issues are to be raised, see 23 V.S.A. § 1205(e)(2), and that a final suspension hearing in any case must occur within forty-two days of the alleged offense absent good cause or the consent of the defendant. See *id.* § 1205(h). Thus, we find no basis for the State's dire warnings of delay that will result from allowing trial courts in civil suspension proceedings to consider the lawfulness of the underlying stop.

Relying primarily on *State v. Stearns*, 159 Vt. 266, 617 A.2d 140 (1992), Justice Skoglund states that our interpretation of § 1205(h)(1) will effectively preclude the State from relying on an officer's affidavit in civil suspension proceedings, which will be transformed into full-blown trials requiring the presence of police officers serving as witnesses. See Justice Skoglund's dissent, 171 Vt. at 47, 49, 757 A.2d at 1036, 1037. Justice Skoglund questions how our holding today comports with the analysis in *Stearns*. See *id.* at 49, 757 A.2d at 1037. Our holding is completely consistent with the analysis in *Stearns*.

In *Stearns*, the pro se defendant prevailed at a civil license suspension proceeding after the trial court accepted his testimony — despite the contradictory affidavit of the arresting officer — that the officer had not given him a fair opportunity to take a breath test. See 159 Vt. at 267, 617 A.2d at 140. The defendant then argued that the State was collaterally estopped in the criminal DUI proceeding from relitigating whether he had refused a breath test. See *id.* at 268, 617 A.2d at 141. Reversing the trial court, this Court concluded that collateral estoppel did not apply because the State did not have a full and fair opportunity in the summary civil suspension proceeding to litigate the issue of whether the defendant had refused the test. See *id.* at 272, 617 A.2d at 143. We reasoned as follows:

> It is one thing for the State to assume the risk that a defendant's license will not be suspended because an officer's affidavit, in the face of defendant's live testimony, does not adequately convince the court. It is quite another thing if the risk includes the substantial chance that defendant also will avoid *criminal* responsibility. As the courts concluded in *Ratliff* and *Moore*, the effect would be that the State would be forced to try the criminal case, with live witnesses, in the civil suspension proceeding. Application of issue preclusion would nullify the summary suspension proceeding that the Legislature enacted.

*Id.* at 271-72, 617 A.2d at 143 (emphasis added). Our analysis relied heavily on the Oregon Supreme Court's reasoning reaching the same holding — no collateral estoppel — in a case in which the hearing officer had entered judgment for the defendant in a civil suspension proceeding after concluding that the underlying police stop was not supported by reasonable suspicion. See *id.* at 269, 617 A.2d at 141-42 (discussing and quoting extensively from *State v. Ratliff*, 744 P.2d 247, 250 (Or. 1987)).

Justice Skoglund suggests that our holding is inconsistent with the analysis in *Stearns* because it precludes the State from relying on the arresting officer's affidavit in civil suspension proceedings, and instead compels the State to try its entire criminal case, with live witnesses, in what was supposed to be a summary proceeding. See Justice Skoglund's dissent, 171 Vt. at 47, 49, 757 A.2d at 1036, 1037. Such concerns apply equally to *any* issue, including any of those explicitly listed in § 1205(h), that a defendant might choose to raise in a civil suspension proceeding. Indeed, the issue that the defendant prevailed on in *Stearns*, notwithstanding the arresting officer's affidavit, was whether he had refused to take a breath test — an issue that § 1205(h)(3) explicitly allows to be raised in civil license suspension proceedings.

Yet, we did not suggest in *Stearns* that allowing the defendant to counter the State's affidavit with live testimony regarding that issue, or any other issue, would undermine the Legislature's goal of expediting civil suspension proceedings. To the contrary, we stated that if the State chooses to rely solely on the arresting officer's affidavit, it must assume the risk that the defendant's license might not be suspended because of the defendant's live testimony challenging that affidavit; however, we concluded that the State should not have to risk losing the *criminal* case because of how the issue was presented in the summary civil suspension proceeding. See *Stearns*, 159 Vt. at 271-72, 617 A.2d at 143. This reasoning is no less true when the defendant challenges the underlying stop in the civil suspension proceeding, as was the situation in *Ratliff*, the case upon which the *Stearns* analysis is based. In short, our law is settled regarding crossover estoppel in DUI civil and criminal proceedings, see *Pollander*, 167 Vt. at 304-07, 706 A.2d at 1360-62, and there is no evidence that the summary adjudication of civil license suspensions has been undermined, even though Vermont trial courts have in the past allowed defendants in such proceedings to challenge the constitutionality of the underlying stops.

Our conclusion that a constitutional stop is a necessary predicate for a finding that an officer had "reasonable grounds" to believe that a person was driving while intoxicated is supported by a significant number of cases in other jurisdictions, as discussed below. In many of those cases, courts construing statutes very similar to § 1205(h) have held that a *lawful* arrest, including a constitutional stop, is a prerequisite for an officer to have reasonable grounds to support a license suspension. Justice Skoglund attempts to distinguish some of the cases by pointing out that the statutes interpreted therein permitted the defendants to challenge the suspension of their licenses on the grounds that they were not "under arrest" when they were asked to submit to an evidentiary test. Justice Skoglund's dissent, 171 Vt. at 48-49, 757 A.2d at 1036-37. Rather than undermine the support that these cases offer for our holding, the distinction only emphasizes the need to construe § 1205(h)(1) broadly to protect Vermont motorists from unwarranted governmental intrusions that are not based on articulable suspicion, let alone probable cause. Cf. *Fishbein v. Kozlowski*, 743 A.2d 1110, 1117 (Conn. 1999) (statute's probable-cause-to-arrest requirement, coupled with provision for administrative hearing, afforded driver all constitutional protection to which he was entitled).

Here are some examples of cases that support our holding. In *Watford v. Bureau of Motor Vehicles*, 674 N.E.2d 776, 778 (Ohio Ct. App. 1996), the court examined a statute that permitted defendants in civil suspension proceedings to contest "'[w]hether the law enforcement officer had *reasonable ground to believe* the arrested person was operating a vehicle . . . under the influence of alcohol . . . and whether the arrested person was in fact placed under arrest.'" (emphasis in opinion). The court held that "a lawful arrest, including a constitutional stop," was required before a refusal to take a test could trigger a license suspension. *Id.*

In *People v. Krueger*, 567 N.E.2d 717, 721-22 (Ill. App. Ct. 1991), the court also addressed the scope of suspension hearings under a statute similar to ours. Refusing to construe the statute in a manner that would authorize unconstitutional arrests or searches and allow license suspensions to be based on the fruits of unconstitutional police conduct, the court concluded that the statute implicitly required that arrests triggering license suspensions be lawful. See *id.* at 722; see also *Gikas v. Zolin*, 863 P.2d 745, 749 (Cal. 1993) (en banc) (license suspension requires lawful arrest based on constitutional stop).

Similarly, in *Pooler v. Motor Vehicles Division*, 755 P.2d 701, 702-03 (Or. 1988) (en banc), the Oregon Supreme Court concluded that

because the legislature implicitly intended to require *valid* DWI arrests, the scope of administrative suspension hearings permitted defendants to raise issues concerning the validity of the underlying stops. See *id.* Like the other courts, the Oregon court expressed concern that a contrary holding would allow police to stop drivers at random without reasonable suspicion in the hopes of identifying the occasional intoxicated motorist. See *id.* at 703. The court declined to attribute to the legislature an intent to condone such unconstitutional procedures. See *id.*

Additionally, in *Brownsberger v. Department of Transportation*, 460 N.W.2d 449, 450 (Iowa 1990), the Iowa Supreme Court examined a statute permitting motorists to reopen license revocation proceedings upon a finding in the later criminal proceeding that the arresting officer did not have reasonable grounds to believe that the motorist was driving while intoxicated. Rejecting the State's argument that the district court erred by equating a finding of "no reasonable grounds to stop" with the more general statutorily mandated finding of "no reasonable grounds to believe that the motorist had been driving while intoxicated," the court concluded that the statute permitted the reopening of license revocation cases when the criminal court found no reasonable basis for the stop. See *id.* at 450-51.

Other courts construing statutes similar to § 1205(h)(1) have refused to allow defendants in civil suspension proceedings to challenge the lawfulness of the investigatory stop. See *Fishbein*, 743 A.2d at 1116-17 (5-2 decision); *Powell v. Secretary of State*, 614 A.2d 1303, 1305 (Me. 1992); *Beavers v. Department of Motor Vehicles*, 851 P.2d 432, 434-35 (Nev. 1993) (per curiam); *Commonwealth v. Wysocki*, 535 A.2d 77, 79-80 (Pa. 1987) (5-1 decision). For the most part, these decisions provide little rationale to support their construction of the statutes in question — other than emphasizing that drunk driving laws are intended to remove intoxicated drivers from the highways in an expedited fashion — and thus we do not find them persuasive. Rather, while we are mindful of the important public purpose of keeping intoxicated drivers off of our highways, we do not believe that the Legislature intended § 1205(h) to permit license suspensions to be based on unconstitutional stops. Cf. *Pollander*, 167 Vt. at 308, 706 A.2d at 1363 (because necessity defense emanates from common law rather than constitutional imperative, Legislature is free to determine whether defense is issue to be considered in civil suspension hearing).

Relying primarily on *State v. District Court*, 129 Vt. 212, 274 A.2d 685 (1971), Justice Skoglund states that it has been this Court's

"understanding" for nearly thirty years that "reasonable grounds" means "that the officer must have formed a reasonable basis to *request* a blood alcohol test from the person under investigation." See Justice Skoglund's dissent, 171 Vt. at 45, 757 A.2d at 1035. By construing § 1205(h)(1) to mean something other than what it explicitly states, Justice Skoglund does precisely what she suggests that this Court is doing — reading into the statute language that is not there. See *id.* at 46, 757 A.2d at 1035. More importantly, the issue before this Court is one of first impression, as recognized by the parties. This Court has never implied, let alone held, that in allowing defendants to challenge whether the law enforcement officer had "'reasonable' grounds to believe the person was operating . . . a vehicle in violation of section 1201," the Legislature intended to preclude defendants from challenging the reasonableness of the stop that led to DUI processing and prosecution. If anything, we have suggested the contrary by recognizing that "'reasonableness' hearings, although not criminal, seek a parallel sort of protection for operators against an arbitrary exercise of . . . police power." See *District Court*, 129 Vt. at 215, 274 A.2d at 686.

## B.

Our construction of § 1205(h)(1) is consistent with this Court's view of the scope of the exclusionary rule. Evidence obtained as the result of constitutional violations by law enforcement officers may not be admitted at trial as a matter of state law because doing so "eviscerates our most sacred rights, impinges on individual privacy, perverts our judicial process, distorts any notion of fairness, and encourages official misconduct." *State v. Badger*, 141 Vt. 430, 452-53, 450 A.2d 336, 349 (1982). In determining the scope of the exclusionary rule, we have not rejected outright a cost-benefit analysis that balances the deterrent effect to be achieved by excluding unlawfully obtained evidence against the cost of excluding such evidence, but we have emphasized that the focus of any such analysis should be on the individual constitutional rights at stake. See *State v. Oakes*, 157 Vt. 171, 174, 598 A.2d 119, 121-22 (1991). Indeed, any empirical assessment indicating that the resulting costs and benefits weigh in favor of admitting unlawfully obtained evidence must be so persuasive as to negate the important rights at stake. See *id.* at 174-75, 598 A.2d at 122; cf. *State v. Robinson*, 165 Vt. 351, 353-55, 683 A.2d 1005, 1007-08 (1996) (because of unique nature of summary contempt, policies behind exclusionary rule do not require suppression of evidence obtained

when contemnor is searched in preparation of incarceration following finding of criminal contempt).

Hence, in *Oakes*, we declined to adopt a "good faith" exception to the introduction of unlawfully obtained evidence in criminal trials because we were unpersuaded by the cost-benefit analysis that the United States Supreme Court followed in *United States v. Leon*, 468 U.S. 897 (1984). See 157 Vt. at 183, 598 A.2d at 126. Since then, the Supreme Court has continued to narrow the scope of the federal exclusionary rule based on questionable reasoning that has been subject to much criticism. See *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984) (exclusionary rule is not applicable in deportation proceedings); *Pennsylvania Bd. of Probation v. Scott*, 524 U.S. 357, 364 (1998) (exclusionary rule is not applicable in parole revocation hearings); see also 1 W. LaFave, Search and Seizure § 1.7(e), at 206-07 (3d ed. 1996) (discussing "extreme and fundamentally unsound" cost-benefit analysis utilized in *INS v. Lopez-Mendoza*).

While the Supreme Court continues to restrict the scope of the exclusionary rule, courts in other jurisdictions are divided on whether the exclusionary rule is applicable in civil license suspension proceedings. See Annotation, *Admissibility, in Motor Vehicle License Suspension Proceedings, of Evidence Obtained by Unlawful Search and Seizure*, 23 A.L.R.5th 108, 123-29 (1994); LaFave, *supra*, at 199-200. Those courts declaring the exclusionary rule inapplicable in such proceedings reason that (1) applying the rule to summary license suspension proceedings would unnecessarily and unduly complicate those proceedings; (2) public interest demands that drunk drivers be removed from the highways; and (3) because the unlawfully obtained evidence has been or will be excluded from related criminal proceedings, there is little additional deterrent effect on police conduct that would result from excluding the evidence in the suspension proceedings. See *Riche v. Director of Revenue*, 987 S.W.2d 331, 334-35 (Mo. 1999); *Powell*, 614 A.2d at 1306-07; *Holte v. State Highway Comm'r*, 436 N.W.2d 250, 252 (N.D. 1989).

We are not persuaded that any of these reasons compel the introduction of unlawfully obtained evidence in civil suspension proceedings. As noted above, the State has not provided us with either empirical evidence or sound argument suggesting that application of the exclusionary rule would seriously undermine the Legislature's intent to create a speedy and summary civil suspension system.

As for the second reason, we recognize the importance of removing intoxicated drivers from Vermont's highways, just as we recognize the

importance of bringing to justice those persons that violate our criminal laws. But the public's interest in having strict police control over persons driving on our highways may not be satisfied at the expense of our constitutional right to be free from unbridled government interference in our lives, see *Holland v. Parker*, 354 F. Supp. 196, 199 (D.S.D. 1973), particularly considering that the State offers no empirical evidence suggesting that applying the exclusionary rule in civil suspension proceedings will have a deleterious effect on preventing the carnage caused by drunk drivers. If the State were permitted to obtain license suspensions based on evidence resulting from unconstitutional stops, the right of individuals to be free from unreasonable governmental intrusion into their private affairs, as guaranteed under Article 11, would be seriously compromised.

Third, in our view, the exclusionary rule is just as necessary to deter unlawful police conduct in the context of civil suspension proceedings as it is in related criminal DWI proceedings. Generally, in both the criminal and civil components of DWI cases the State presents the same evidence from the same stop made by the same police officer. Further, in both the civil and criminal cases, license revocation is often the most long-lasting and significant sanction imposed on the defendants. See 23 V.S.A. §§ 1205(a), (m), 1206, 1208, 1210; *Whisenhunt v. Department of Public Safety*, 746 P.2d 1298, 1299 (Alaska 1987). The nationwide campaign against drunk driving has taught us, if nothing else, that the threat of criminal prosecution has little impact on keeping problem drinkers off of our highways. As a result, the focus of state legislatures and law enforcement agencies has been on removing intoxicated motorists from highways by suspending their licenses or otherwise preventing them from driving. Because the primary objective of DUI laws and law enforcement is to remove intoxicated drivers from our highways, the deterrent effect of the exclusionary rule would be weakened significantly if it were not applied in civil suspension proceedings. See *Whisenhunt*, 746 P.2d at 1299.

As noted, if the exclusionary rule were not applied in civil suspension proceedings, law enforcement officers could make investigatory stops based on hunches or stereotypical beliefs, or for any or no reason whatsoever, knowing that even if any evidence obtained from the stop were to be suppressed in criminal proceedings, license suspensions could still follow. Given the significance of obtaining license suspensions, allowing unlawfully obtained evidence to be admitted in civil suspension proceedings could encourage disregard

for the constitutional limits of a legal stop. See LaFave, *supra*, at 202-03 (highly relevant factors in determining whether to apply exclusionary rule in quasi-criminal proceedings are magnitude of consequences for individual involved and extent to which nonexclusion would encourage unlawful searches and seizures); cf. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700-02 (1965) (exclusionary rule is applicable in forfeiture proceedings because they are quasi-criminal in character and can result in punishment even greater than in underlying criminal case).

In sum, notwithstanding that the license suspension system is civil in nature and does not demand all of the procedural safeguards required in criminal proceedings, see *State v. O'Brien*, 158 Vt. 275, 277, 609 A.2d 981, 982 (1992), we conclude that it is appropriate to apply the exclusionary rule in civil license suspension proceedings to protect the core value of privacy embraced in Article 11, to promote the public's trust in the judicial system, and to assure that unlawful police conduct is not·encouraged. See *Lopez-Mendoza*, 468 U.S. at 1060 (Marshall, J., dissenting) (exclusionary rule enables "judiciary to avoid the taint of partnership in official lawlessness" and assures public that "government [will] not profit from its lawless behavior").

The essence of the Chief Justice's remarks in his dissent is that the danger of drunk driving supersedes the right of Vermonters to be free from governmental intrusion into their private affairs. The Chief Justice accuses this Court of having done a "great disservice" to law enforcement officials by concluding that the potential risk of unlawful police conduct exceeds the actual risk of drunk driving. See 171 Vt. at 42-43, 757 A.2d at 1033. Nowhere in our decision do we make such a conclusion. Our holding has nothing to do with the likelihood of whether police officers will act in good faith or how often they will make illegal stops. Rather, we seek to provide an enforcement mechanism for constitutional rights that protect citizens against unlawful government intrusions. This Court's enforcement of those rights does no more disservice to law enforcement officers than the existence of the rights themselves. Indeed, assuming the Chief Justice's faith in law enforcement officials is well-founded, our holding will have no impact whatsoever on the prosecution of DUI civil suspensions.

It is the duty of this Court to see that constitutional rights are upheld. By precluding the introduction of evidence obtained as the result of constitutional violations, the exclusionary rule protects those "most sacred rights." See *Badger*, 141 Vt. at 452-53, 450 A.2d at 349.

We emphasized in *Oakes* that the focus of any cost-benefit analysis concerning application of the exclusionary rule should be on the individual constitutional rights at stake. See 157 Vt. at 174, 598 A.2d at 122. Yet, even though there is not the slightest indication that allowing defendants in DUI civil proceedings to challenge the constitutionality of police stops would have any impact on the proliferation of drunk drivers on our highways, the Chief Justice would hold that the risk of returning intoxicated drivers to the road outweighs any marginal benefits that result from the suppression of relevant and reliable evidence of intoxication in a civil suspension proceeding. We believe that there is more than marginal benefit in upholding the important constitutional right at stake here — the right of citizens to be free from unwarranted governmental intrusion into their private affairs.[2]

## II.

Having determined that defendants in civil license suspension proceedings may challenge the constitutionality of the underlying stops, we now examine the bases for the investigatory stops that occurred in the two cases before us. As noted, the law is well-settled that police may stop a vehicle and briefly detain its occupants to investigate a reasonable and articulable suspicion that a motor vehicle violation is taking place. See *Sutphin*, 159 Vt. at 11-12, 614 A.2d at 793-94; *State v. Boardman*, 148 Vt. 229, 231, 531 A.2d 599, 601 (1987). Here, both stops resulted from what the officers believed to be motor vehicle violations pertaining to the proper operation of taillights.

There are four relevant statutes. The first, 23 V.S.A. § 1221, provides that a motor vehicle operated on a highway "shall be in good mechanical condition and shall be properly equipped." The second, 23 V.S.A. § 4(37), refers to "tail lamps" in defining the terms "standard equipment" and "properly equipped." The third, 23 V.S.A. § 1243(a), provides that a motor vehicle

---

[2] Apparently, in the Chief Justice's view, allowing police to briefly detain and question motorists for any or no reason at all would not be an affront to the constitutional privacy rights of Vermonters because investigatory stops are not as intrusive as searches or seizures. See Chief Justice Amestoy's dissent, 171 Vt. at 41, 757 A.2d at 1031-32. This view ignores the reality that searches and seizures often begin with an investigatory stop. More importantly, both the Vermont Constitution and the United States Constitution require that police have, at minimum, a reasonable and articulable suspicion of wrongdoing before making even a brief, investigatory stop. See *State v. Siergiey*, 155 Vt. 78, 80-81, 582 A.2d 119, 121 (1990).

shall also be equipped with at least two lighted head lamps of substantially the same intensity and with reflectors and lenses of a design approved by the commissioner of motor vehicles, and with a lighted tail or rear lamp of a design so approved. A motorcycle . . . [shall be] equipped with at least one lighted head lamp and at least one lighted tail or rear lamp . . . . A side car attached to such motorcycle . . . shall be equipped with a light on the right side of such side car visible from the front thereof.

The fourth, 23 V.S.A. § 1248, provides that:

A person shall not use on any motor vehicle a rear lamp, unless such lamp has been approved by the commissioner of motor vehicles, nor unless it shows a clear red light visible from the rear, and throws a clear white light over all parts of the rear number plate on such vehicle in such a manner that all numerals, letters and marks on such plate are clearly visible and legible for at least fifty feet from the rear of such vehicle.

## A.

In the case of defendant Steven Lussier, the officer stopped him because one of his passenger car's two taillights was not functioning. Focusing on the fact that §§ 1243 and 1248 refer to "a" taillight or rear lamp, defendant argues that the stop was unlawful because Vermont law requires only one functioning taillight.

We find no merit to this argument. Taillights are standard equipment designed and intended to illuminate the rear corners of motor vehicles automatically upon the simultaneous illumination of the vehicle's headlights and upon application of the brake pedal. Taillights are part of the standard safety lighting equipment regularly installed by the manufacturer on all passenger vehicles to ensure that the corners of the vehicles are safely illuminated at night. Nothing in the above-quoted statutes negates these obvious facts, notwithstanding the Legislature's use of the word "a" in §§ 1243 and 1248. See § 4(37) (employing plural "tail lamps" in defining terms "standard equipment" and "properly equipped").

Section 1243 requires "at least two lighted head lamps of substantially the same intensity" for motor vehicles, but requires only "at least one lighted head lamp and at least one lighted tail or rear lamp" for motorcycles or mopeds. Rather than using the phrase "at least

_____" to designate the number of taillights required on motor vehicles, the section refers to "a" lighted tail or rear lamp of a design approved by the commissioner. Thus, when referring to taillights on motor vehicles, § 1243 focuses exclusively on design guidelines, not the required number of such lights.

Section 1243 requires that light designs, including taillight designs, be of a type approved by the commissioner of motor vehicles. Department of Motor Vehicle regulations state that "all lamps or lighting devices mounted on the exterior of a motor vehicle must be of a type approved by the commissioner of motor vehicles, or must meet the standards prescribed in 49 CFR 571.108." 8 Code of Vermont Rules 14 050 022-78. There are no specific designs approved by the commissioner under the rules, but, not surprisingly, the cited federal regulations require two red taillamps on the rear of passenger cars, one on each side of the vertical centerline at the same height and as far apart as practicable. See 49 C.F.R. § 571.108, Tables I-IV, at 300-03 (1998). Section 1243 may not have been artfully drafted, but its use of the indefinite article, in and of itself, does not demonstrate that the Legislature intended to require motor vehicles to display only one taillight. See *Craw v. District Court*, 150 Vt. 114, 119, 549 A.2d 1065, 1069 (1988) (presumption obtains against statutory construction that would lead to absurd results); *In re A.C.*, 144 Vt. 37, 42, 470 A.2d 1191, 1194 (1984) (statutes are entitled to reasonable construction, but it is essential that interpretation not be such that will render statute ineffective or lead to irrational consequences).

■ As with § 1243, § 1248 is not intended to designate the number of taillights required on a motor vehicle, but rather to indicate how such lights should function. Nothing in that section, appropriately named "taillights," suggests that a passenger vehicle need only have one functioning taillight. Because defendant's passenger vehicle had only one functioning taillight and thus was not properly equipped, the arresting officer had a reasonable and articulable basis for stopping the vehicle to issue a citation or merely inform the operator of the problem.

## B.

Our analysis in the second case is the same, but we reach the opposite conclusion. According to the police affidavit in that case, defendant Robert Lussier was stopped because one of the two white lights that was supposed to illuminate his truck's rear license plate

was not functioning. Under § 1248, a rear lamp must throw a clear white light over all parts of the rear license plate so that all of the plate's numbers and letters are clearly visible from at least fifty feet. Here, the State presented no evidence that the numerals or letters on defendant's rear plate were not illuminated to the degree required by § 1248. Nor does the State dispute defendant's contentions that he had one functioning rear license plate light that illuminated the plate to the degree required by the statute.

Examining the federal regulations under our earlier analysis, we find that they require passenger vehicles to display only one rear white license plate lamp to illuminate the plate from the top or sides. See 49 C.F.R. § 571.108, Tables I-IV, at 300-03. Because the undisputed evidence was that the rear license plate on defendant's vehicle was properly illuminated, the State has failed to demonstrate a reasonable and articulable basis for the stop.

*The judgment in the case of Steven Lussier is affirmed; the judgment in the case of Robert Lussier is reversed.*

**Amestoy, C.J.,** dissenting. Contrary to the conclusion of the majority, I believe the Vermont General Assembly could reasonably exclude from consideration in a civil license suspension hearing a defendant's challenge to the underlying motor vehicle stop, and did so in the explicit language of 23 V.S.A. § 1205(h)(1). I also believe the majority errs in deciding that application of the exclusionary rule is necessary to deter unlawful police conduct in the context of civil suspension proceedings. I therefore respectfully dissent.

As the majority correctly observes, the issues at a final civil license suspension hearing *"shall be limited"* to five. 23 V.S.A. § 1205(h) (emphasis added). The first of these is "whether the law enforcement officer had reasonable grounds to believe the person was operating, attempting to operate or in actual physical control of a vehicle in violation of section 1201 of this title." *Id.* § 1205(h)(1). Section 1201 sets forth the prohibition against operating, attempting to operate, or physically controlling a motor vehicle while under the influence of alcohol or other drugs.

As we recently explained in *State v. Pollander*, 167 Vt. 301, 308, 707 A.2d 1359, 1363 (1997), "[t]he plain language of 23 V.S.A. § 1205(g)* indicates the Legislature's intent *to limit* the issues that may be

---

*Former § 1205(g) has since been redesignated as § 1205(h).

presented at a civil suspension hearing to those enumerated in the statute." (emphasis added). We noted in this regard that the summary suspension system was created for the legitimate purpose of "protecting public safety by quickly removing 'potentially dangerous drivers from the road.'" *Id.* at 307-08, 707 A.2d at 1363 (quoting *State v. Strong*, 158 Vt. 56, 61, 605 A.2d 510, 513 (1992)). Thus, limiting the cognizable issues at a civil suspension hearing to those specifically enumerated "serves the goals of the statute by minimizing procedural delay." *Id.* at 309, 707 A.2d at 1363. Accordingly, we held in *Pollander* that the defendant's attempted assertion of the necessity defense was barred by the plain language of § 1205(h), and that no further analysis of legislative intent was necessary or proper. See *id.*

Defendants here, as in *Pollander*, raised a defense in a civil suspension proceeding that was not among those enumerated in § 1205(h). They claimed in each case that the arresting officer had no reasonable and articulable suspicion that a motor vehicle violation was taking place, and hence no valid basis for the stop. See *State v. Sutphin*, 159 Vt. 9, 11, 614 A.2d 792, 793 (1992). Notwithstanding the absence of this issue among those set forth in § 1205(h), the majority concludes that defendants were entitled to assert the claim because "the Legislature *assumed* that a constitutional stop would be a necessary predicate" to finding that the arresting officer had reasonable grounds to believe that the defendant was driving while intoxicated. 171 Vt. at 23, 757 A.2d at 1020 (emphasis added).

As ably articulated in Justice Skoglund's dissenting opinion, the majority's conclusion does not withstand analysis. Nothing on the face of the statute or logically implicit in the text supports an assumption that the Legislature considered a legal stop to be a "necessary predicate" to a reasonable belief that a person was driving under the influence. The issue that defendants attempted to raise was whether the arresting officer had a reasonable and articulable basis to stop them for *motor vehicle* violations. This is an entirely different question from whether the officers had reasonable grounds to believe that defendants were operating a vehicle in violation of § 1201, i.e., while under the influence of alcohol. The former is not logically subsumed within the latter.

The majority's construction of § 1205(h)(1) strains logic and reason. A plain reading of the statute would limit the cognizable issue in these cases to whether the officers had reasonable grounds, at the time they requested the blood alcohol tests, to believe that defendants had been driving or in actual physical control of a vehicle while under the

influence of alcohol. And the only facts logically relevant to this issue occurred *after* the motor vehicle stops, when the officers observed signs of intoxication in both drivers. Expanding the scope of a suspension hearing beyond these circumstances to include claims relating to the initial motor vehicle stop adds a new category to § 1205(h) which is neither logically implied nor clearly necessary to its effective implementation. See *State v. O'Neill,* 165 Vt. 270, 275, 682 A.2d 943, 946 (1996) (Court must not "read into a statute something which is not there unless it is *necessary* in order to make the statute effective"). Indeed, a number of other courts have so concluded, interpreting similar or identical statutes to hold that the validity of the underlying motor vehicle stop lies outside the scope of issues to be determined in a civil suspension proceeding. See, e.g., *Powell v. Secretary of State,* 614 A.2d 1303, 1305-06 (Me. 1992); *Beavers v. Department of Motor Vehicles,* 851 P.2d 432, 434-35 (Nev. 1993); *Commonwealth v. Wysocki,* 535 A.2d 77, 79 (Pa. 1987).

Nor, apart from the statutory language, is there any overriding constitutional imperative to conclude that the Legislature must have "assumed" that a valid motor vehicle stop was a necessary predicate to a finding that the officer had reasonable grounds to believe the person was DUI. Although we have reserved the question whether due process rights may trump the statutory limitations of § 1205(h), see *Pollander,* 167 Vt. at 307 n.4, 707 A.2d at 1362 n.4, we have generally held that the exclusion of unlawfully seized evidence is not a personal constitutional right, but a judicially created remedy. See *State v. Robinson,* 165 Vt. 351, 354, 683 A.2d 1005, 1007 (1996); see also *Stone v. Powell,* 428 U.S. 465, 486 (1976). But cf. *State v. Oakes,* 157 Vt. 171, 174, 598 A.2d 119, 121 (1991). Moreover, the United States Supreme Court has never seen fit to apply the exclusionary rule in a civil proceeding, nor — until today — has this Court. See *United States v. Janis,* 428 U.S. 433, 447 (1976) (noting that Supreme Court "never has applied [exclusionary rule] to exclude evidence from a civil proceeding, federal or state" and refusing to extend rule to civil tax assessment proceeding); *Immigration & Naturalization Serv. v. Lopez-Mendoza,* 468 U.S. 1032, 1051 (1984) (declining to extend exclusionary rule to federal deportation proceeding); see also *United States v. Calandra,* 414 U.S. 338, 351-52 (1974) (holding exclusionary rule inapplicable in grand jury proceeding). Recognizing that the exclusionary rule is designed primarily to deter unlawful police conduct, the Supreme Court has regularly applied a cost-benefit analysis in its decisions, balancing the potential deterrent effect of

excluding unlawfully seized but reliable evidence against the resulting costs to societal interests. See *Lopez-Mendoza*, 468 U.S. at 1041. This Court has applied a similar test, while emphasizing the importance of individual rights and liberties in any cost-benefit equation. See *Oakes*, 157 Vt. at 174, 598 A.2d at 121.

Although this Court has not previously applied such a cost-benefits analysis in the civil suspension context, other state courts have considered the issue. As the majority notes, these decisions are divided, with a significant number determining that the societal costs of excluding reliable and relevant evidence that licensed operators have driven intoxicated far outweigh the incremental deterrent effect of applying the exclusionary rule. See, e.g., *Fishbein v. Kozlowski*, 743 A.2d 1110, 1118-19 (Conn. 1999); *Westendorf v. Iowa Dep't of Transp.*, 400 N.W.2d 553, 557 (Iowa 1987); *Powell*, 614 A.2d at 1306-07; *Riche v. Director of Revenue*, 987 S.W.2d 331, 334-35 (Mo. 1999); *Holte v. State Highway Comm'r*, 436 N.W.2d 250, 252 (N.D. 1989). The reasoning of the courts in these decisions is persuasive. They conclude that the imposition of an exclusionary sanction in a civil suspension proceeding adds only marginally to its deterrent effect in the related criminal proceeding, while its costs in terms of public safety are substantial. See *Fishbein*, 743 A.2d at 1118-19; *Westendorf*, 400 N.W.2d at 557; *Riche*, 987 S.W.2d at 335; *Powell*, 614 A.2d at 1307; *Holte*, 436 N.W.2d at 252. As the Maine Supreme Court succinctly explained:

> Because the evidence has already been excluded from the criminal proceeding, there is little additional deterrent effect on police conduct by preventing consideration of the evidence by the hearing examiner. The costs to society resulting from excluding the evidence, on the other hand, would be substantial. The purpose of administrative license suspensions is to protect the public. Because of the great danger posed by persons operating motor vehicles while intoxicated, it is very much in the public interest that such persons be removed from our highways.

*Powell*, 614 A.2d at 1306-07 (citation omitted).

Notwithstanding these sound and well-reasoned decisions from other states, the majority concludes that application of the exclusionary rule in the civil suspension context is "appropriate" for three reasons: (1) "to protect the core value of privacy" under the Vermont Constitution; (2) "to promote the public's trust in the judicial system";

and (3) "to assure that unlawful police conduct is not encouraged." 171 Vt. at 33, 757 A.2d at 1026-27. I do not believe these reasons withstand scrutiny.

First, the majority notes that any cost-benefit analysis must focus on the constitutional right at stake, suggesting that the "core value of privacy" and "'sacred rights'" at issue here far outweigh any countervailing public interest. *Id.* at 33, 757 A.2d at 1027 (quoting *State v. Badger*, 141 Vt. 430, 452-53, 450 A.2d 336, 349 (1982)). Despite the rhetoric, the majority fails to focus on the specific interest at issue. We have repeatedly observed that privacy is a fluid concept, contingent upon the specific circumstances presented. Its scope must be determined by the "reasonable expectation of privacy in the affairs or possessions intruded upon." *State v. Morris*, 165 Vt. 111, 120, 680 A.2d 90, 96 (1996). The "intrusion" in this, as in most civil suspension proceedings, consists of an ordinary traffic stop, "a temporary and brief detention that is exposed to public view." *State v. Zumbo*, 157 Vt. 589, 592, 601 A.2d 986, 988 (1991). Defendants here were briefly detained and questioned. Containers from inside their vehicles were not searched without a warrant, cf. *State v. Savva*, 159 Vt. 75, 86-87, 616 A.2d 774, 780-81 (1991); possessions were not seized, nor confessions obtained, pursuant to coercive police questioning, cf. *Badger*, 141 Vt. at 440-43, 450 A.2d at 342-44; residences were not searched based on warrants lacking probable cause. Cf. *Oakes*, 157 Vt. at 172-73, 598 A.2d at 120. The degree of police intrusion here did not begin to approach the level in these and other decisions in which this Court has justifiably excluded illegally obtained evidence. Thus, while automobile drivers may assuredly assert the exclusionary rule in a *criminal* action, where substantial liberty interests are at stake, withholding that defense in a *civil* suspension proceeding simply does not, as the majority claims, implicate "the core value of privacy" embraced by our Constitution. 171 Vt. at 33, 757 A.2d at 1026.

This conclusion is in no way altered when one considers "the public's trust in the judicial system," the majority's second ostensible reason for holding the exclusionary rule to be "appropriate" in this context. *Id.* Recognizing that such considerations are purely speculative, I would nevertheless dispute the conclusion that reading the exclusionary rule into a statute where it does not appear in the text, rejecting the considered holdings of other states that have declined similar invitations to judicial legislation, excluding otherwise reliable evidence of intoxicated driving, and allowing inebriated drivers to return to the public highways with their licenses intact, is the way to

inspire public trust in our judicial system. This Court has in the past recognized "the serious threat posed to public safety by the frequency with which individuals, while under the influence of intoxicating liquor, continue to operate motor vehicles on the public highways." *State v. Martin*, 145 Vt. 562, 568, 496 A.2d 442, 447 (1985). I respectfully suggest that Vermonters, acting through their elected representatives, could reach a similar conclusion. Therefore, to the extent relevant, fostering public trust in the judiciary clearly mandates application of the civil suspension statute as it was written, without the judicial gloss imposed by the majority.

Turning to its final reason, the majority suggests that application of the exclusionary rule is necessary to "assure that unlawful police conduct is not encouraged." 171 Vt. at 33, 757 A.2d at 1027. Expanding on this point, the majority explains that if the exclusionary rule were not available in civil suspension proceedings, law enforcement officers would have an incentive to make investigatory stops "based on hunches or stereotypical beliefs, or for any or no reason whatsoever." *Id.* at 32, 757 A.2d at 1026. The police stops in these cases and in the two pending appeals that raise similar issues, *State v. Nickerson*, Docket No. 98-530 and *State v. Rash*, Docket No. 98-531, do not provide even a remote basis for the majority's alarm. Indeed, in none of the cases is there even a suggestion that the vehicles were stopped on the basis of "stereotypical beliefs" or "hunches." See *Nickerson* (defendant, stopped at border after Canadian customs officials observed him to be visibly intoxicated, revealed BAC of .204); *Rash* (defendant, stopped after citizen informant reported defendant driving intoxicated and described vehicle, tested for BAC of .160). Nor is there an allegation that the defendants were unlucky intoxicated drivers caught in a web of "random stops" that also netted sober drivers. Since in each of the four cases considered the defendant had a BAC of .08 or greater at the time of the stop, one would have to suspend the laws of probability to believe — as the majority apparently does — that Vermont law enforcement officers are making investigatory stops of drivers "for any or no reason whatsoever." 171 Vt. at 32, 757 A.2d at 1026.

Before suggesting that the exclusionary rule must be applied in this context "'to avoid the taint of partnership in official lawlessness,'" some showing of the "lawlessness" ought to be required. *Id.* at 33, 757 A.2d at 1027 (quoting *Lopez-Mendoza*, 468 U.S. at 1060 (Marshall, J., dissenting)). There is no evidence of it in these cases and, in my view, it is a great disservice to law enforcement officials, and the public they

serve, to conclude — as the majority's exclusionary rationale must — that the *potential* risk of unlawful police conduct in Vermont far exceeds the *actual* risk of drunk driving. The majority disclaims that its holding has anything "to do with the likelihood of whether police officers will act in good faith or how often they will make illegal stops." *Id.* The majority's expressed concern over police "'lawlessness,'" *id.*, and "unlawful government intrusions," *id.*, suggests otherwise.

Finally, I take exception to the majority's description of my rationale as one which would allow police "to briefly detain and question motorists for any or no reason at all." *Id.* at 34 n.2, 757 A.2d at 1027. I assume the majority does not intend to replace accuracy with hyperbole, so I respectfully emphasize that I do *not* believe police can detain and question motorists for any or no reason at all. Systematic stops without particularized suspicion must adhere to the requirements of *State v. Record,* 150 Vt. 84, 89, 548 A.2d 422, 425 (1988) (upholding sobriety checkpoints that satisfy minimal guidelines).

It is conceivable, of course, that law enforcement officers undeterred by the exclusion of evidence in a criminal DUI proceeding would engage in a pattern of stopping motorists "for any or no reason at all" in the hope of securing evidence of intoxication for use in a civil suspension hearing. But there is nothing in the record to support the majority's claim that affirmance of the judgments would lead to this result, or "strip Vermonters of their constitutional right to be free from unwarranted governmental intrusion into their private affairs." 171 Vt. at 24 n.1, 757 A.2d at 1020 n.1. The majority does not cite a single instance, much less any pattern, of unwarranted police intrusion into Vermonters' private affairs (unless the majority is suggesting that the officer's mistaken judgment concerning the requisite number of rear license plate lights on defendant Robert Lussier's vehicle was such an invasion). Absent such a showing of abuse, application of the exclusionary rule in this context is unsupported by precedent, logic, or experience.

This Court has often stressed that the purpose of civil suspension is to protect "public safety by quickly removing potentially dangerous drivers from the roads," *Strong,* 158 Vt. at 61, 605 A.2d at 513, that it is intended as a "remedial," not a criminal sanction, *id.* at 60, 605 A.2d at 513, and consequently that due process rights which traditionally apply in a criminal proceeding may be superseded in the civil context in the interest of saving lives. See *id.* at 62, 605 A.2d at 614 (license

suspension is not criminal punishment invoking double jeopardy protection); *Shaw v. District Court*, 152 Vt. 1, 7, 563 A.2d 636, 640 (1989) (no right to jury trial in civil suspension proceeding). The protection of individual privacy rights may well compel the suppression of otherwise reliable evidence in a criminal prosecution, even at the cost of insulating a guilty driver from criminal sanctions. The protection of privacy does not, however, require insulating intoxicated drivers from civil suspension of their driving privileges where the State has relevant and reliable evidence of intoxication. Or so, at the very least, the Legislature could reasonably have concluded.

For the foregoing reasons, therefore, I would affirm the judgments. I am authorized to state that Justice Skoglund joins in this dissent.

**Skoglund, J.,** dissenting. My disagreement with the majority begins with its expansion of the civil suspension process based on an unsupported interpretation of legislative intent. Viewed dispassionately, 23 V.S.A. § 1205(h) sets forth a comparatively clear and concise set of issues to be considered in a civil suspension proceeding. *None* of them concerns the legality of the motor vehicle stop preceding the officer's request that a driver submit to a blood alcohol test. Nor does the "reasonable grounds" language of § 1205(h)(1) support the majority's conclusion that the Legislature must have "assumed" the legality of the stop. 171 Vt. at 23, 757 A.2d at 1020. I must respectfully dissent.

Section 1205(h) provides that the issues to be considered in a summary suspension proceeding "shall be limited" to five. On this, there is no dispute. The majority begins its analysis, however, by observing that it finds "[n]othing in the language of § 1205 or the purpose behind the statute" to suggest that the Legislature intended to *preclude* motorists from challenging license suspensions based on the constitutionality of the underlying stop. *Id.* With this summary dismissal of the restrictive language of § 1205(h) and a puzzling assumption of legislative purpose at the threshold, the majority takes its first misstep.

The principal objective of statutory interpretation is to discern and implement the Legislature's intent, and the primary source of that intent is to be found in the plain and ordinary meaning of the words chosen. See *In re P.S.*, 167 Vt. 63, 70, 702 A.2d 98, 102 (1997). As noted, the issues at a civil suspension hearing are limited to five: (1) whether the officer had reasonable grounds to believe the person was operat-

ing a vehicle in violation of § 1201 of this title,[1] (2) whether at the time of the request for the evidentiary test the officer informed the person of the person's rights and the consequences of taking and refusing the test, (3) whether the person refused to permit the test, (4) whether the test was taken and the results indicated that the person's alcohol concentration was 0.08 or more at the time of operation and whether the testing methods were valid and reliable and whether the test results were accurate and accurately evaluated, and (5) whether the statutory requirements for consenting to an evidentiary test were met. 23 V.S.A. § 1205(h)(1)-(5).

The first issue to be determined in a civil suspension proceeding is whether the law enforcement officer "had reasonable grounds to believe the person was operating, attempting to operate or in actual physical control of a vehicle in violation of section 1201 of this title." *Id.* § 1205(h)(1). The majority reads this section to require reasonable grounds to suspect a DWI violation before an officer can effect a motor vehicle stop. This is the second misstep, as I will explain below. And, in light of this interpretation of subsection (h)(1), the majority concludes that "the Legislature assumed that a constitutional stop would be a necessary predicate to finding 'reasonable grounds' for suspicion of DUI." 171 Vt. at 23, 757 A.2d at 1020. Because I don't believe the majority's reading of subsection (h)(1) is correct, I also do not believe the assumptions attributed to the Legislature are valid.

Viewed on its own terms and in context, the only plausible meaning of the "reasonable grounds" requirement is that the officer must have formed a reasonable basis to *request* a blood alcohol test from the person under investigation, that is, were there indicia of intoxication that would support a request that the person submit to an evidentiary test? Indeed, this has been the Court's understanding since at least *State v. District Court*, 129 Vt. 212, 274 A.2d 685 (1971). There the Court construed an earlier version of § 1205 which provided, in terms nearly identical to the current statute, for a "summary hearing [to] take evidence relating to the reasonableness of the officer's belief that the respondent was operating a vehicle under the influence of intoxicating liquor or drugs." *Id.* at 214, 274 A.2d at 686. Justice Barney, writing for the Court, explained the purpose of this requirement as follows:

---

[1] 23 V.S.A. § 1201 prohibits driving under the influence of intoxicating liquor or other substances that impair the ability to drive safely.

> [T]he legislature has taken steps to protect operators from arbitrary, capricious or otherwise unreasonable demands that a test be taken. This is accomplished by its requirement that it be adjudicatively determined whether or not the belief of the officer, from which the request to test is generated, is a reasonable one . . . . The duty of the court is to evaluate the facts and circumstances presented as persuading the officer that he should *request the respondent to take a test.*

*Id.* at 214-15, 274 A.2d at 686-87 (emphasis added). Thus, the plain meaning of the "reasonableness" requirement is, and has been, clearly understood for nearly thirty years as referring to the request for an evidentiary test.

The current civil suspension statute retains the relatively simple and straightforward requirement that an officer form a reasonable basis to believe that the driver was under the influence of alcohol or drugs before requesting an evidentiary test. See 23 V.S.A. § 1205(h)(1). The majority's construction replaces this limited prerequisite, substituting a more expansive inquiry into whether the officer had reasonable grounds to believe the person was committing a crime, a motor vehicle violation, or some other conduct that would justify the initial detention. This new test is created, despite the absence of any language in the statute referring to the validity of the initial stop or detention. Expanding the statute in this manner contravenes fundamental principles of statutory construction. See *State v. O'Neill,* 165 Vt. 270, 275, 682 A.2d 943, 946 (1996) (Court must not "read into a statute something which is not there unless it is *necessary* in order to make the statute effective").

The statutory context of § 1205(h)(1) lends additional support to the conclusion that it serves merely as a predicate for requesting an evidentiary test. As noted, the question of whether the officer had reasonable grounds to believe the driver was DUI is the first of *five* issues to be determined in a civil suspension proceeding. The remaining issues to be determined are whether the officer informed the person of his or her rights and the consequences of taking and refusing the test, whether the person refused to permit the test, whether the test was taken and indicated a BAC of .08 or higher, whether the test results were accurate and accurately evaluated, and whether the requirements of our implied consent law, see 23 V.S.A. § 1202, were satisfied. In short, beginning with the officer's basis (or "reasonable grounds") for requesting blood alcohol testing, *every*

*subsequent issue set forth in § 1205(h) relates to the administration of the test.*

The Legislature's intent to limit the reasonableness inquiry to the basis of the officer's request for blood alcohol testing is evident, as well, from the summary and informal nature of the proceeding. The statute expressly provides that civil suspension hearings "shall be summary proceedings." 23 V.S.A. § 1205(j); see also *State v. Stearns*, 159 Vt. 266, 271, 617 A.2d 140, 142 (1992) ("The Vermont civil suspension system is intended to work in a speedy and summary fashion."). To this end, the rules for civil suspension proceedings provide for procedural informality, and the rules of evidence generally do not apply. See D.C.C.R. 80.5(f); *Stearns*, 159 Vt. at 271, 617 A.2d at 142-43. The Legislature has specifically provided that affidavits of law enforcement officers and chemists are admissible to prove the State's case. See 23 V.S.A. § 1205(j). The statute further specifies that a law enforcement officer's affidavit "shall be in a standardized form for use throughout the state and shall be *sufficient* if it contains the following statements." *Id.* § 1205(b) (emphasis added). The section then sets forth seven separate criteria, including the certification of the officer, the results of the test and the time and date it was taken, and a statement indicating that the officer "had reasonable grounds to believe the person was operating, attempting to operate or in actual physical control of a vehicle in violation of section 1201." *Id.* § 1205(b)(3). Again the statutory requirements focus primarily upon the qualifications to administer an appropriate evidentiary test.

As this Court explained in *Stearns*, "[t]he system is structured so that the State can prove its case without taking the arresting officer from law enforcement duties to testify." 159 Vt. at 271, 617 A.2d at 143. This will no longer be the case. Opening the civil hearing to constitutional challenges to the underlying motor vehicle stop will effectively preclude the State from relying on an officer's affidavit. What once was sufficient under § 1205(h) will no longer suffice. The State will be compelled to call the officer as a witness, and the "summary proceedings" contemplated by the statute will only exist in memory. Indeed, absent any requirement that defendants disclose the issues or testimony they intend to present at the hearing, the State may be compelled to keep officers on stand-by status in case there is a challenge to the validity of the underlying stop. See D.C.C.R. 80.5(e); *Stearns*, 159 Vt. at 271 n.2, 617 A.2d at 143 n.2. It is difficult to imagine a result more at odds with the language and purpose of the civil suspension statute.

In all but one of the cases from other jurisdictions relied upon by the majority, the decisions were based upon operative language that does not appear in Vermont's civil suspension statute. *Pooler v. Motor Vehicles Div.*, 755 P.2d 701 (Or. 1988), is typical. The civil suspension hearing there was limited to several issues, including whether "[t]he person, at the time the person was requested to submit to a test . . . was *under arrest* for driving while under the influence of intoxicants." *Id.* at 702. That requirement, not found in our statute, formed the basis of the Oregon court's decision. As the court explained: "[T]he arrest which is a prerequisite to a lawful suspension . . . must be a valid arrest. . . . If the arrest must be valid, it follows that the scope of the administrative hearing before the hearings officer included the question of the validity of the arrest." *Id.* at 702-03. Similar statutory language formed the basis of the decisions in *People v. Krueger*, 567 N.E.2d 717, 722-23 (Ill. App. Ct. 1991) (holding that "under arrest" requirement of civil suspension statute required finding of valid arrest); *Watford v. Bureau of Motor Vehicles*, 674 N.E.2d 776, 778 (Ohio Ct. App. 1996) (construing "under arrest" provision of civil suspension statue to mean that "a lawful arrest, including a consti-tutional stop, must take place"); and *Gikas v. Zolin*, 863 P.2d 745, 749 (Cal. 1993) (noting that "under arrest" provision of civil suspension statutes means that "the underlying arrest must have been lawful").[2] The one exception cited by the majority is *Brownsberger v. Depart-ment of Transportation*, 460 N.W.2d 449 (Iowa 1990). There, however, the court's decision was based upon a specific statute permitting a

---

[2] Even these decisions have not gone unchallenged. In *Fishbein v. Kozlowski*, 743 A.2d 1110 (Conn. 1999), the Connecticut Supreme Court recently rejected the argument that the "probable cause to arrest" element of its civil suspension statute incorporated a requirement that the initial investigative stop of the driver be lawful. As the court explained:

> We accordingly conclude . . . that the legislature did not intend that the lack of a reasonable and articulable suspicion to justify an initial investigatory stop would be a basis for overturning the commissioner's decision if the commissioner finds that, subsequent to the stop, "the police officer [had] probable cause to arrest the person for operating a vehicle while under the influence of intoxicating liquor . . . ." . . . Any interpretation that prevented the commissioner from suspending the license of a person who was stopped without a reasonable and articulable suspicion, but whom the police subse-quently had probable cause to arrest for driving while intoxicated, would undermine the primary purpose of the statute, which is "to protect the public by removing potentially dangerous drivers from the state's roadways with all dispatch compatible with due process." Nothing in the legislative history . . . suggests a contrary conclusion.

*Id.* at 1116-17 (citations omitted).

defendant to reopen a civil suspension when a court in a criminal action rules that the arresting officer lacked reasonable grounds. The court noted that the statute had effectively superseded an earlier decision holding that the exclusionary rule did not apply in civil suspension proceedings. See *id.* at 451. Thus, these cases are of little assistance in our quest to understand the legislative intent of our civil suspension statute.

With the majority's ruling, the summary civil procedure envisioned by the Legislature will now be transformed into a full blown trial on issues not appearing in the civil suspension statute. It may be that there will cease to be value in pursuing a civil suspension. In *Stearns* this Court rejected the defendant's claim that the State was collaterally estopped from relitigating in the criminal case the court's earlier ruling in the civil suspension hearing on the issue of defendant's alleged refusal to take the test. See 159 Vt. at 272, 617 A.2d at 143. We suggested that, in civil suspension hearings, it was the State's decision whether to risk that a defendant's license would not be suspended because an officer's affidavit could not adequately convince the court in the face of defendant's live testimony on an issue. *Id.* at 271-72, 617 A.2d at 143. To hold otherwise, the Court observed, would force the State "to try the criminal case, with live witnesses, in the civil suspension proceeding," which would "nullify the summary suspension proceeding that the Legislature enacted." *Id.* at 272, 617 A.2d at 143. How does that analysis of our civil suspension statute comport with today's ruling?

For all of the foregoing reasons, therefore, I am unpersuaded that the civil suspension statute permitted defendants to challenge the validity of the underlying motor vehicle stops. I am equally unpersuaded, for the reasons discussed in the dissenting opinion of the Chief Justice, of any overriding constitutional imperative to read such a requirement into the statute. Accordingly, I join in his dissent. I would affirm the judgments. I am authorized to state that the Chief Justice joins in this dissent.

### On Motion for Reargument

In a decision issued April 28, 2000, we reversed a district court decision and held that a defendant in a civil suspension proceeding may challenge the reasonableness of the underlying stop. Because the State had failed to show a reasonable and articulable basis for the stop, we also reversed the district court's decision suspending defendant's license. The State has filed a motion to reargue, arguing that the

Court erred by failing to remand this case to provide the State with another opportunity to present evidence on the reasonableness of the stop.

At the civil suspension hearing, defendant challenged the reasonableness of the stop. He testified that only one of two lights that illuminates his rear license was not working at the time the police officer stopped him; thus, he argued that the State had failed to show that his rear license plate was not properly illuminated. The court, however, did not find defendant's testimony credible. It relied instead on the affidavit of the officer, which stated that he had observed defendant traveling "with a rear plate not lit." Because the State's evidence was accepted below and because the State never sought a continuance to present further evidence, we do not believe it appropriate to remand to allow the State another opportunity to present further evidence.

The State's motion to reargue, filed May 12, 2000, fails to identify points of law or fact overlooked or misapprehended by this Court. The motion is therefore denied. See V.R.A.P. 40.